Gwendolyn RECK (formerly Gwendolyn Erwin), Individually, and as Next Friend of Amy Reck, a Minor, Appellant,

v.

Kathy LONDOW, Virginia Mattix–Hill and John Brian, Appellees.

No. 09–92–241 CV.

Court of Appeals of Texas, Beaumont.

Submitted April 6, 1995.

Decided Oct. 26, 1995.

Jimmy W. Nettles, Beaumont, Cheryl A. Schultz, Law Office of Gilbert T. Adams, Beaumont, for appellant.

Dan Morales, Atty. Gen., Lynn E. Carter, Asst. Atty. Gen., Austin, for appellees.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

BURGESS, Justice.

This suit arose as a result of the Texas Department of Human Services's (DHS), removal of Amy Reck (Amy), a fifteen year old, from the home of her mother/guardian, Gwen Reck (Gwen) and stepfather, Kenneth Erwin (Erwin). Amy had made allegations of sexual molestation against Erwin. Initially Gwen did not believe the allegations and refused to require Erwin to leave the home. DHS then received a court order and removed Amy from the home, placing her initially with family friends and ultimately in foster care. Amy was subsequently returned to her mother's home.

Gwen Reck, individually and as next fried of Amy Reck, Clifton Scott Reck (Scott) and Shannon Reck (Shannon)[1] sued DHS, Kathy Londow (Londow), Virginia Mattix–Hill (Hill), Ranny Voight (Voight), John Brian (Brian) and Mike Spell (Spell). The individuals were sued in both their individual capacities and as employees of DHS. The suit complained of numerous alleged acts of DHS and its employees during DHS' investigation of the molestation and the period of DHS' subsequent temporary custody of Amy. The Recks pleaded the Texas Tort Claims Act (TTCA) alleging negligent use of tangible personal property. They alleged bad faith, intentional infliction of emotional distress, malice, gross negligence and civil conspiracy.

Jury question one asked whether the negligence of the employees of the DHS in the use of tangible personal property proximately caused mental anguish to any of the plaintiffs. The jury answered in favor of Gwen, Amy and Scott. Question two awarded them damages. Question three found Brian intentionally inflicted emotional distress on Gwen and Amy. Questions four and five awarded them damages and exemplary damages. Questions six through eight made the same inquiries about Spell and exonerated him.[2] Question nine found Londow intentionally inflicted emotional distress on Gwen and Reck. Questions ten and eleven awarded them damages and exemplary damages. Question twelve found Hill intentionally inflicted emotional distress on Gwen and Amy. Questions thirteen and fourteen awarded them damages and exemplary damages. Questions fifteen through seventeen made the same inquiries about Voight and exonerated him.[3] Question eighteen inquired about the civil conspiracy—the jury answered in favor of each defendant.

The trial court granted a Judgment Notwithstanding the Verdict in favor of all defendants.[4]

Appellants urge a single point of error: "The trial court erred in granting the Motion for Judgment Notwithstanding the Verdict because there was some evidence to support

---

1. No jury findings were favorable to this plaintiff and no appeal has been taken.

2. No appeal has been taken from these findings.

3. No appeal has been taken from these findings.

4. No appeal has been taken from the granting of the judgment nov in favor of DHS.

the jury findings as to the intentional infliction of emotional distress and an award of damages, and the law does not preclude judgment on the verdict."

■ Before addressing the point of error, we must consider appellees' argument that TEX. CIV. PRAC. & REM.CODE ANN. § 101.106 (Vernon 1986)[5] bars any judgment against London, Hill or Brian. The answer is found in the TTCA itself. Section 101.057 states: "This chapter does not apply to a claim: ... (2) arising out of assault, battery, false imprisonment, or any other intentional tort...."

The TTCA specifically exempts intentional torts from the waiver of immunity. *City of San Antonio v. Dunn,* 796 S.W.2d 258, 261 (Tex.App.—San Antonio 1990, writ denied).

■ To sustain the trial court's granting of a Motion for Judgment Notwithstanding the Verdict, the review is that of "no evidence". In reviewing the record, the appellate court must view the evidence in the light most favorable to the jury's findings, considering only the evidence and inferences supporting them and rejecting all evidence and inferences contrary to the findings. *Williams v. Bennett,* 610 S.W.2d 144 (Tex. 1980).

In *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993), the Supreme Court acknowledged this court's recognition of the tort of intentional infliction of emotional distress by adopting the elements of the tort as expressed in the RESTATEMENT (SECOND) OF TORTS § 46 (1965) in *Tidelands Automobile Club v. Walters,* 699 S.W.2d 939 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.). They went on to state: "Today we become the forty-seventh state to adopt the tort of intentional infliction of emotional distress as set out in § 46(1) of the RESTATEMENT (SECOND) OF TORTS." *Id.* at 621–22.

The questions concerning intentional infliction of emotional distress were correctly submitted under *Twyman* as follows:

Did [individual defendant] intentionally inflict emotional distress on any of the persons listed below?

To constitute the intentional infliction of emotional distress, all of the following four elements must be present:

a. That [the individual] acted intentionally or recklessly,

b. that the conduct of [the individual] was extreme and outrageous,

c. that the actions of [the individual] caused one or more of the persons listed below mental distress, and

d. that the mental distress suffered was severe.

"Intentionally or Recklessly" means that the actor desires to inflict severe emotional distress or where he knows that such distress is substantially certain to result from his conduct.

"Extreme and outrageous" conduct is that conduct which exceeds all reasonable bounds of decency. Conduct which is required or authorized by law or Texas Department of Human Services' policies and procedures is not extreme or outrageous conduct.

By the terms "severe" and "emotional distress" is meant all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea. It is only where said emotional state is extreme that liability for severe emotional distress arises. By "severe" is meant that the distress inflicted is so severe that no reasonable man could be expected to endure it without undergoing unreasonable suffering.

■ The Recks argue several acts[6] by Brian as "some evidence" of intentionally outrageous or extreme conduct. The first act alleges Brian approved and ratified all

**5.** Stating: "A judgment in an action or a settlement of a claim under [the Tort Claims Act] bars any action involving the same subject matter by the claimant against the employee of the governmental unit whose act or omission gave rise to the claim."

**6.** The acts alleged by each individual are referred to by the numerical designation in the Reck's brief.

the intentional outrageous conduct of London and Hill. This is not substantiated by the Recks' references to the record.[7] It is not the duty of this court to make an independent search of the statement of facts. *See Fredonia State Bank v. American Life Ins.*, 881 S.W.2d 279, 283 (Tex.1994) citing *Saldana v. Garcia*, 155 Tex. 242, 285 S.W.2d 197, 201 (1955). In addition, the Recks present no legal authority that one is liable for the intentional infliction of emotional distress by approving or ratifying acts.

■■ The second act has two parts. The first part asserts Brian stated he had no concerns about the trial court's feelings or the trial court's orders not being complied with. The Reck's references concern Brian's approval of the decision to return Amy to Gwen and his communications with his staff on that issue. DHS's counsel asked Brian if those communications contained any reference to being afraid of a judge or what that judge might do. Brian's response was: "No. I have no concerns about Judge Walker or what he might do to us." Thus, in context, Brian's statement was about his state of mind and not any direct communication to either Amy or Gwen. This does not constitute outrageous or extreme conduct. The second part asserts Brian verified that no contact was made with the Orange Police Department about Amy being drugged and raped. Brian's verification at trial, at best, was an admission of DHS's failure to report the crime to the Orange Police Department. While perhaps negligent, there is no evidence it was intentional nor outrageous or extreme conduct.

■ The last act alleges Mr. Brian displayed "an attitude toward ... Amy Reck that she had consented to take drugs and have sex which helped her to understand what had happened to her and that the experience had no impact on her." Brian was asked to agree that Amy would need counseling because of the experience of being drugged and raped. He answered "Possibly" and went on to explain his answer. Even if his testimony could be characterized as alleged by the Recks, once again it is trial

testimony and there is no evidence any of these things were communicated to Amy or Gwen. This does not constitute outrageous or extreme conduct.

Having found no evidence of outrageous or extreme conduct on the part of Brian, the point of error as to him is overruled.

The Recks argue several acts by London as "some evidence" of intentional outrageous or extreme conduct. The first act alleges London violated Gwen's moral standards that her child have no sexual contact. This is not substantiated by the Recks' references to the record.

■ The second act has three parts, one about interrogating Scott on his knowledge of sex, one about screaming at Gwen over the telephone and one about throwing child care pamphlets at Gwen. The jury did not find in favor of Scott, therefore the first part is arguably irrelevant. However, the record references only indicate an interview took place and is not descriptive of the interview. Simply interviewing a child about a molestation allegation which occurred in the child's home does not constitute outrageous or extreme conduct. The second part is based on the single statement: "And, so, she was—she started kind of yelling at me and— on the phone and she was saying. . . ." As characterized, this does not constitute outrageous or extreme conduct. The Recks' references to support the third part indicate Spell threw two pamphlets at Gwen Reck; therefore it is no evidence of intentional outrageous or extreme conduct on the part of London.

■ The third act involves eavesdropping on Amy and Gwen's conversations during visitations and watching them through a two-way mirror. Gwen testified about a visit with Amy at the DHS Office: "[T]hey put me in a room that had a two-way mirror and bugs on the wall—no little crawly bugs, the kind that you listen bugs all over the room. . . ." When asked how that made her feel, she answered: "It made me real angry and it just did not—I don't know. It just really made me angry that I had to be put in a room and be watched through a two-way

---

7. The Recks reference 40 pages from the testimo- ny of Ms. Mattix–Hill.

mirror with bugs on the wall." Viewing Gwen's testimony under the proper standard, there is no evidence anyone watched through the mirror or made use of the "bugs". Simply being placed in such a room, without more, does not constitute outrageous or extreme conduct.

The final act alleges deliberately showing the criminal record of Erwin and relating his sex crimes to Amy. Once again, this is not substantiated by the Recks' references to the record.[8]

Having found no evidence of outrageous or extreme conduct on the part of Londow, the point of error as to her is overruled.

The Recks also point to several acts by Hill as "some evidence" of intentional outrageous or extreme conduct. The first act alleges Hill allowed Amy to watch sexually explicit shows on television. Once again, this is not substantiated by the Recks' references to the record.[9]

The second act asserts Hill threatened Gwen with the criminal records of Erwin by waiving them in the air and then not allowing Gwen to see any part of the records. Again, this is not substantiated by the Recks' references to the record.[10]

■ The third act alleges Hill insisted that once girls, such as Amy, have sex, they will always have sex and because of this, Amy must take birth control pills. Gwen testified Hill described a conversation with Amy where birth control was discussed and Amy had rejected taking birth control pills. Hill wanted Gwen to try to get Amy to take the pills. Gwen replied it was not a good idea; Amy did not need to be taking birth control pills nor did she even need to be dating; what Amy needed was "counseling— and to get herself emotionally straightened out". Gwen related the meeting ended with her telling the matter of Amy taking birth control pills would have to be discussed with the Recks' attorney. Gwen further related

she attempted to explain to Hill that giving Amy the pills would be confusing to the child in that the child was being told it is not a good thing to have sex, but then asking her to take the pills. Gwen said she told Hill that making Amy be on the pills would make it look like the sex with Erwin was consensual when it was not. According to Gwen, Hill's reaction to the counselling suggestion was "she said something about that it was her experience that when girls become sexually active that they just continue to have sex and can't control it or something along those lines." It is questionable the incident can properly be characterized as Hill being insistent to any degree. However, the discussion of Amy's sexual activity and the recommendation that Amy take birth control pills, while it may contradict certain beliefs, even Gwen's, does not rise to the level of outrageous or extreme conduct, that is, conduct which exceeds all reasonable bounds of decency.

■ The fourth act alleges Hill "set up barricades" to Gwen getting Amy back after Gwen got a confession from Erwin on molesting Amy. However, the only mention within the Reck's references to the record is a note from an assistant district attorney to Hill which states: "Virginia, if there is any reason Amy shouldn't go back, let me know pronto so we can start building barricades. Thanks, J.W." The Recks fail to point out any evidence that "building barricades" was a suggestion of anyone other than the assistant district attorney. Furthermore, there is no discussion or references to the record that "barricades" (whatever those are) were built by anyone, much less Hill.[11]

The sixth act alleges Hill developed a plan to take Amy from Gwen on a permanent basis. Again, this is not substantiated by the Recks' references to the record.

The eighth act asserts Hill did not bother to obtain the last names of one of the adult

---

8. The Recks' reference a portion of Shannon Reck's testimony that makes no mention of this matter.

9. The Reck's reference the testimony of Gwen Reck about visitation periods.

10. The reference shows Gwen Reck's testified the acts were those of Dr. Ray Coxe.

11. The Recks do reference Plaintiff's Exhibit 4 en toto. It contains excerpts from four files and contains 132 pages.

males who had given Amy drugs and raped her, although Hill had access to the identity of the man. Again, this is not substantiated by the Recks' references to the record.[12]

 The ninth act has two parts. The first part asserts Hill inferred the drugging and raping of Amy was "nothing but a party" for Amy. The record reflects Hill was questioned about an interrogatory and her response. The interrogatory asked: "In your opinion, what was the cause of anything unusual occurring or happening to the child, Amy Reck, within a few days before she was returned to Gwendolyn Erwin?". Hill's response was: "I feel that she left to party and intended to return after her good time." Hill testified the response was only her belief why Amy initially left the foster home. Neither Hill's interrogatory response nor her testimony is, as claimed by the Recks, an inference that Amy's drugging and raping was "nothing but a party" for her. They do not constitute outrageous or extreme conduct. The second part asserts Hill admitted that if it had been her child, she would have wanted the men prosecuted. The Recks reference is to a trial statement by Hill's and is no evidence of any intentional nor outrageous or extreme conduct towards Amy or Gwen.

The tenth act alleges Hill made it clear to Amy that nobody cared about her being given drugs or being raped. Once again, this is not substantiated by the Recks' references to the record.[13]

Having found all the acts alleged by Hill against Amy as not being intentionally outrageous or extreme conduct, the point of error as to Hill's conduct toward Amy is overruled.

 The fifth act asserts Hill told Gwen she was never going to get Amy Reck back. Ms. Reck testified:

— like Virginia Mattix had made the statement to me that Amy would not be returned, but I thought she was just a caseworker and was misinformed. I didn't really believe that that's what they were doing. . . . But as time went on, it be-

gan—I mean, it was just becoming more and more apparent that that's what they were going to do. . . .

While it may be tempting to resolve this by pointing out Ms. Reck admitted she did not believe Hill when the statement was made, under the standard of review we cannot. The statement as reflected in Gwen's testimony, standing alone, does not constitute outrageous or extreme conduct. However, it may be considered in conjunction with other acts. .

 The seventh act alleges Hill attempted to take advantage of Gwen when she was hysterical over Amy's disappearance from the foster home by attempting to obtain Gwen's signature on the permanency plan to give up Amy. Gwen testified Hill notified her on November 10, 1989 that Amy had run away from the foster home. During that conversation, Hill asked Gwen if she was going to sign the staffing plan of November 1, 1989, which Gwen had previously refused to sign because she understood it was a plan for Amy not to return to Gwen. Gwen testified she became upset, began crying and was hysterical. She called Brian to express concern about Amy's disappearance. She also complained about Hill's request that the November staffing plan be signed and became so upset that she could not talk. The question of when conduct becomes so extreme and outrageous that it exceeds all reasonable bounds of decency may be a fact issue. Our Supreme Court has not defined "all reasonable bounds of decency". As previously noted, we must reinstate the jury finding if there is "more than a scintilla" or "some evidence" to support the finding. That evidence may be direct, circumstantial or reasonable inferences from the evidence. There is some evidence from which the jury could have determined Hill's inquiry about Gwen signing the placement plan, under the circumstances, was an attempt to take advantage of Gwen when she was hysterical over Amy's disappearance. We cannot say, as a matter of law, this does not constitute outrageous or extreme conduct.

---

12. The Recks reference testimony from a counselor regarding sessions with Gwen, Amy and Scotty Reck. This testimony makes no mention of Ms. Mattix–Hill.

13. The Recks' reference the beginning testimony of Shannon Reck. He only mentions Ms. London, not Ms. Mattix–Hill.

The question remains whether Hill's actions caused Gwen severe and emotional distress as correctly defined in the court's charge. Appellees argue there is no evidence such distress was severe or that the specific acts of Hill caused the emotional distress. Gwen testified that upon being asked to sign the placement plan after being told of Amy's disappearance she became upset, started crying and finally became hysterical. Furthermore, when she called Brian and complained about Hill's request she became so upset she could not talk. A co-worker testified when Gwen received a telephone call on November 10 she talked on the phone a few minutes when she began crying and her face got red. Gwen was in tears and so shaken that she had to be driven home. Clearly there is some evidence the actions of Hill caused Gwen to suffer emotional distress. The final inquiry is whether that emotional distress was severe. By "severe" is meant that the distress inflicted is so severe that no reasonable man could be expected to endure it without undergoing unreasonable suffering. The jury's determination that Gwen suffered severe emotional distress when Hill asked her to sign the permanent placement plan, which she viewed as not only a significant document, but a devastating document, after being told her daughter had disappeared is supported by some evidence. The point of error as to Hill and Gwen is sustained.

The trial court erred in granting the Judgment Notwithstanding the Verdict as it pertained to Hill's intentional infliction of emotional distress on Gwen. Therefore, the judgment of the trial court is reversed and rendered under Jury Questions 12 and 13. Gwen Reck shall recover of Virginia Mattix–Hill the sum of Four Hundred Thousand ($400,000.00) dollars.[14] In all other aspects, the judgment is affirmed.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

14. The point of error did not attack the trial court's action as to the exemplary damages.