United States Court of Appeals,

Fifth Circuit.

No. 96-40151.

Peggy Nell HART, Plaintiff-Appellee,

v.

Harold B. O'BRIEN, DPS Officer, et al., Defendants,

Harold B. O'Brien, DPS Officer;  Frank Montana, DPS Officer;
C.T. Myrick, Law Enforcement Officer;  Carl Motley;  Jeff Starnes,
Assistant Lamar County Attorney, Defendants-Appellants.

Nov. 6, 1997.

Appeals from the United States District Court for the Eastern
District of Texas.

Before BARKSDALE, EMILIO M. GARZA and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Various state and county officials searched the home of Peggy
Nell Hart ("Hart"), arrested her, and charged her with possession
of marijuana.  She remained in jail more than two weeks.  After the
state dismissed the charges, Hart filed suit pursuant to 42 U.S.C.
§ 1983 and state law against Red River County, Texas ("the county")
and a number of the officials involved in the case.  These
officials include Jeff Starnes, an assistant county attorney in
Lamar County;  Harold O'Brien and Frank Montana, both Texas
Department of Public Safety ("DPS") narcotics officers;  and Carl
Motley and Tommy Myrick, who were at the time Red River County
sheriff's deputies (collectively, "the officials").  The county and
the officials then moved for summary judgment, with the county
arguing that it could not be vicariously liable for the actions of
its officials and the officials variously asserting absolute,

1

qualified, and official immunity. The district court granted the county summary judgment and Myrick summary judgment in part, but denied the rest of the motions. The officials mount an interlocutory appeal of the portion of the district court's judgment dealing with immunity. Finding error as a matter of law, we reverse the district court's judgment on qualified immunity and official immunity; we render judgment in favor of all the officials on the federal claims and in favor of O'Brien and Montana on the state law claims.

I

In reviewing a district court's denial of a motion for summary judgment on the grounds of immunity, we must view the facts in the light most favorable to the nonmovant. *Blackwell v. Barton,* 34 F.3d 298, 301 (5th Cir.1994).[1]

Hart and David Conine lived near each other in a rural area of Red River County. Conine resided in a trailer and Hart in a white house with black trim and shutters; their homes were separated by a pasture and partly surrounded by dense woods. However, the summary judgment evidence also reveals that Hart, at times, spent the night at Conine's trailer.

On August 11, 1992, the state and county conducted an aerial survey of the property surrounding the trailer and the white house with black trim, and they discovered several marijuana patches.

---

[1]Our recitation of facts accepts Hart's evidence and reasonable inferences from it as true and should not be construed as expressing any view as to the weight or credibility of her evidence. *Salas v. Carpenter,* 980 F.2d 299, 304 n. 3 (5th Cir.1992).

2

O'Brien was assigned to investigate. O'Brien believed that the marijuana was growing on land owned or controlled by Conine, and determined that Conine had been arrested in 1985 for growing marijuana and operating a methamphetamine laboratory on the same property. O'Brien, along with Montana and nine police officers, conducted surveillance on the Conine residence and the surrounding property for about two weeks. O'Brien and Montana jointly supervised the operation. The agents ultimately determined that six marijuana patches existed: three were in a tree line across a pasture from Hart's home (one being directly across the pasture from the home), one was near a trash dump southwest of the Hart residence, one was northeast of the trash dump, and one was amidst some trees directly behind the Hart home.

The officers saw Hart engage in certain activities (or saw signs of such activities) that led them to believe she was residing in Conine's trailer. Hart does not contest that the officers made the following observations:

! On August 12, Hart stayed overnight at Conine's residence.

! On August 13, Hart and Conine left the property. Upon Hart and Conine's return the next day, the officers observed them unloading clothes from Conine's vehicle and taking them into the trailer.

! Hart spent that night in the trailer.

! Hart stayed at least two other nights in the trailer during the two-week surveillance period.

! Hart went out to eat occasionally with Conine.

! Hart would feed the animals in and around Conine's barn.

! The officers observed Jerry Benton, a known marijuana grower, visit the Conine residence. Hart was at the residence

3

during at least some of Benton's visit.

! Conine and Hart drove in the direction of the trash dump, which is located near one of the marijuana patches. Hart exited the truck to open the gate to the dump and stayed there until Conine finished dumping some trash.[2]

Around August 24, O'Brien and Starnes drafted a search and arrest warrant and two supporting affidavits, both signed by O'Brien. The affidavits contained information on the activities the officers saw. The warrant, as signed by the state district judge, commands the appropriate law enforcement officers "to enter the suspected place and premises described in [the attached] Affidavit and to there search for the property described in said Affidavit and bring it before me and persons described in said Affidavit and arrest them and bring them before me." In the first affidavit, the "property to be searched" included Conine's trailer and barn, a vacant white-frame house, "a single-family, white frame residence with black trim and shutters," various outbuildings, and a number of cars (hereinafter "the property"). Hart lived in the white house with black trim and shutters, although the affidavit did not say so. The affidavit did refer to two of the cars "on the property" as being registered to Hart. The affidavit also noted

_____

[2]The officers also assert in affidavits and deposition testimony that they observed Hart and Conine embrace, Conine urinate in front of Hart, Hart make breakfast for Conine and Benton, Hart come out on the porch of the trailer in the morning wearing a robe, and Conine make "heat runs" (i.e., drive his car in a certain way to determine if he was being followed) with Hart in the car. Hart disputes these alleged observations. Because we are to view the facts in the light most favorable to Hart, *Blackwell,* 34 F.3d at 301, we will not consider disputed facts in determining whether the officers had, or reasonably believed that they had, probable cause to search Hart's home or to arrest her.

4

that the property was controlled by Conine and "[a]n unknown white female, approx. 5'6" tall with brown hair and medium build." The affidavit "charges and accuses" Conine and the unknown white female of possessing marijuana.

The second affidavit contained the facts allegedly supporting probable cause. This affidavit repeats the information about the white house with black trim and shutters and the two cars registered to Hart. The only other reference to Hart is the following:

> During the almost continuous surveillance on Conine's property, affiant observed Conine enter and leave the property on numerous occasions. On several of those occasions, Conine and/or an unknown, white female with light brown hair who is residing at the mobile home, has stopped by the white frame house with black trim and shutters, entered the residence and returned a short time later. The unknown, white female has been seen by Affiant driving a blue Buick, registered to a Peggy Hart. Peggy Hart is married to Stanley Hart, who according to [Drug Task Force ("DTF") ] files, is a known marihuana cultivator in Red River County, Texas.

This paragraph contains at least two pieces of inaccurate information. First, Hart did not reside at the mobile home, though she did stay over on several occasions. Rather, she lived in the adjacent white frame house with black trim. Second, Hart was not married to Stanley Hart. Instead, a *different* Peggy Hart was married to Stanley Hart. The officers claim that the first piece of information came from their surveillance of the property. Starnes admits that he helped prepare the affidavit[3] and that he gave the second piece of information to O'Brien for inclusion in the

---

[3]For simplicity, we will refer to the two affidavits as "the affidavit."

affidavit.

O'Brien swore and subscribed to the affidavit.  Based on this affidavit, a state district judge signed the search and arrest warrant on August 24.  The next day, a team of law enforcement officers (Motley and Myrick among them), led by O'Brien and Montana, converged on the property to execute the search and arrest warrant.  Starnes accompanied them.  Starnes concedes that, after he saw Hart, he realized that she was not the Peggy Hart married to Stanley Hart, and that the affidavit was partially based on erroneous information.  However, he did not attempt to halt the execution of the warrant.

There was some debate about whether Hart, after being arrested, should be left behind to care for Conine's animals.  Nonetheless, O'Brien and Montana executed the warrant;  they instructed Myrick to arrest Hart and Motley to take her to jail.  The officers also arrested Conine and took him to jail.  During the search of the property, the officers seized a number of items, including 1,132 live marijuana plants.[4]  While executing the search warrant, the officers found drugs and drug paraphernalia in Conine's trailer, including two baggies of marijuana, two bongs, the butt of a marijuana cigarette in an ashtray, firearms, ammunition, and $19,000 in cash.  In addition, officers found

---

[4]Several weeks after Conine's and Hart's arrest, a survey of the land revealed that the marijuana plants had not been growing on land owned by Conine (or Hart).  Apparently, "Conine was taking advantage of the isolated nature of the area to grow marihuana on neighboring tracts of land." *United States v. Conine,* 33 F.3d 467, 468 (5th Cir.1994).

cocaine in Conine's barn and a bag of marijuana seeds inside a shed adjacent to his property. The only objects seized that have been identified specifically as Hart's were some personal papers found in a storage shed on Conine's property. Conine subsequently pled guilty to a drug charge and is now incarcerated. *See generally United States v. Conine,* 33 F.3d 467 (5th Cir.1994).

After Motley took Hart to jail, he filed a criminal complaint against her, charging her with possession of marijuana with intent to deliver and writing the words "federal hold" on the document. According to Motley's deposition testimony, Starnes, O'Brien, Montana, and Myrick had previously discussed putting Hart on federal hold, and Motley did so, pursuant to O'Brien's instructions. Hart was given a hearing before a state magistrate judge on the charge in the complaint. At the hearing, the magistrate was supposed to determine, among other things, whether probable cause existed for further detention and the amount of bail. The magistrate denied bail. On the charge sheet from the hearing (which is signed by the magistrate), the phrase " *Bail is denied" is circled and next to it someone has written "Federal Hold."

However, no federal official had lodged a federal detainer against Hart. Motley testified in his deposition that he thought the "federal hold" was intended to detain Hart long enough to allow federal Drug Enforcement Agency ("DEA") officers to speak to her. Apparently, the officers wanted to give federal authorities the opportunity to intervene in the case before Hart could post bail.

7

The next day, O'Brien filed a superseding complaint against Hart, charging her with possession of marijuana in an amount between five and fifty pounds. The magistrate judge conducted a hearing on the new charge, this time setting bail at $50,000. On September 11, seventeen days after Hart's arrest, someone posted bail for her and she was released on bond. Prosecutors subsequently dismissed the charges against Hart because of insufficient evidence.

Hart then sued Starnes, O'Brien, Montana, Motley, Myrick, and Red River County under 42 U.S.C. § 1983, asserting that her arrest and subsequent incarceration had violated her rights under the Fourth and Fourteenth Amendments and that the search of her property violated her rights under the Fourth Amendment. She also alleged pendent state claims against these defendants for false imprisonment, malicious prosecution,[5] and intentional infliction of emotional distress. Hart alleges that Starnes and O'Brien inserted false statements into the affidavit either intentionally or with reckless disregard for the truth. Hart's theory is that the officials knew she was not involved in Conine's marijuana cultivation, but, in order to pressure her into providing evidence against him, they arrested her, charged her with a drug offense, detained her without bail for a day, and then did nothing to try to free her during the two weeks or so she remained jailed.

At this point, it is worth summarizing the officials'

---

[5]Hart did not sue Myrick or the county for malicious prosecution.

8

involvement in this matter. O'Brien and Montana jointly supervised the surveillance and search of the property. O'Brien requested the warrant. O'Brien and Montana instructed the officers to execute the warrant by arresting Hart and taking her to jail. Myrick did not participate in the surveillance, but he was involved in the search of the property and Hart's arrest. After the search, Motley took Hart to jail and signed the initial criminal complaint against her, writing "federal hold" on it. O'Brien signed a new criminal complaint against Hart the next day. Starnes advised the officers during the investigation, assisted O'Brien in the preparation of the warrant application, and was present during the execution of the warrant.

Starnes, Motley, Myrick, and Red River County moved for summary judgment on various grounds. In particular, Starnes asserted absolute and qualified immunity against the federal claims and Motley and Myrick claimed qualified immunity against the federal claims. Also, O'Brien and Montana moved for summary judgment, professing that they were qualifiedly immune against the federal claims and officially immune against the state ones. After Hart filed her response to the summary judgment motions, O'Brien and Montana filed an "objection" to certain evidence that Hart submitted in response to their particular motion.

The district court then (1) granted the county summary judgment; (2) granted Myrick summary judgment based on qualified immunity on the federal claims and as a matter of law on the intentional infliction of emotional distress claim; (3) denied the

9

remaining motions for summary judgment; and (4) dismissed the objection to certain of Hart's evidence as moot.

In this interlocutory appeal, all the officials assert that the district court erred in denying their motions for summary judgment on the grounds of immunity; Starnes asserts that he has absolute or qualified immunity, and O'Brien, Motley, Montana, and Myrick aver that they have qualified and official immunity. In addition, O'Brien and Montana argue that the district court erred in refusing to strike certain evidence Hart submitted in opposition to their summary judgment motion.

Hart disputes these contentions. She also maintains that we do not have jurisdiction over the interlocutory appeal.

II

We review *de novo* the denial of a motion for summary judgment on the grounds of qualified or absolute immunity. *Nerren v. Livingston Police Dep't,* 86 F.3d 469, 470 & n. 1 (5th Cir.1996). In doing so, we employ the same criteria as the district court, and construe all facts and inferences in the light most favorable to the nonmoving party. *Id.; LeJeune v. Shell Oil Co.,* 950 F.2d 267, 268 (5th Cir.1992). Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex v. Catrett,* 477 U.S.

10

317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### III

We must first examine the basis of our jurisdiction. *Mosley v. Cozby,* 813 F.2d 659, 660 (5th Cir.1987). A court of appeals has jurisdiction of appeals from all final district court decisions. 28 U.S.C. § 1291. Under the collateral order doctrine, however, interlocutory appeals from district court orders denying summary judgment on the basis of absolute or qualified immunity may be immediately appealed, assuming these orders are based on an issue of law. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

Recently, the Supreme Court clarified the scope of *Mitchell.* In *Johnson v. Jones,* 515 U.S. 304, 312, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995), the Court distinguished between orders that resolve legal wrangles and those that determine "evidence sufficiency" disputes. If, for example, the district court denies

summary judgment on the basis that, given the set of undisputed facts, the defendant official's conduct was not objectively reasonable in light of clearly established law, the official may seek immediate appeal. If the district court denies summary judgment on the grounds that *material* facts exist which a party may or may not be able to prove at trial, the official must await final judgment before appealing. *Id.*

In *Behrens v. Pelletier,* --- U.S. ----, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996), the Supreme Court interpreted its holding in *Johnson.* It emphasized that *Johnson* did *not* stand for the proposition that a party must delay an appeal until final judgment if the district court based summary judgment on an evidence sufficiency determination, *i.e.,* if the court determined that "material issues of fact remained." If that were true, then a party could never appeal a denial of summary judgment. Rather, the *Behrens* court ruled, *Johnson* merely held that:

> determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly "separable" from the plaintiff's claim, and hence there is no "final decision" under ... *Mitchell.*

*Id.* --- U.S. at ----, 116 S.Ct. at 842.[6]

---

[6]In *Johnson,* the defendant officers claimed that they did not beat the plaintiff and were not present while others beat him. The district court determined that a triable issue existed on that point, and denied summary judgment in favor of the officers. The Supreme Court ruled that this denial could not be appealed until final judgment.

In *Behrens,* the defendant was a supervisory agent of the

12

In the instant case, the district court did not deny summary judgment because there is a genuine dispute of material fact that the officials are responsible for searching Hart's home, arresting her, and not taking any action to end her detention. The parties did not disagree over whether the officials had engaged in such conduct. Rather, the court denied summary judgment because (1) "disputed issues of material fact" existed over whether the officials violated Hart's clearly established constitutional rights of which a reasonable person would have known under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and similar cases and (2) the underlying facts are too unsettled to determine if the officials acted with objective reasonableness. In short, the district court determined that there were sufficient uncontested facts to establish that the officers engaged in the conduct in question, but that there were insufficient uncontested facts to decide whether the officials enjoyed immunity as a matter of law. Hence, the officials may argue on interlocutory appeal (as they do here) that, contrary to the district court's judgment, enough uncontested facts exist to determine that they are immune as a matter of law and that, on the

Federal Home Loan Bank Board and responsible for monitoring the operations of a thrift. The defendant wrote the thrift, suggesting that it replace its managing officer, the plaintiff in the action. The thrift then asked the plaintiff to resign; when he refused, it fired him. The defendant did not dispute his actions. Rather, he moved for summary judgment, contending that he had not violated any of the plaintiff's clearly established rights regarding his employment. The district court denied the motion. The Supreme Court held that this denial could be immediately appealed.

13

basis of these facts, they are immune. *Behrens,* --- U.S. at ----, 116 S.Ct. at 842; *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 531 (5th Cir.1997).

Accordingly, under *Mitchell, Johnson,* and *Behrens,* we have jurisdiction over the officials' interlocutory appeal of the district court's denial of summary judgment on the grounds of immunity for Hart's section 1983 claims. This means that we also have jurisdiction over the officials' appeal of denial of summary judgment on the grounds of immunity for Hart's state claims. *Cantu v. Rocha,* 77 F.3d 795, 803-04 (5th Cir.1996).

IV

O'Brien and Montana filed an "objection" to certain evidence that Hart submitted in response to their summary judgment motion. Specifically, they allege (1) that statements made in connection with the "federal hold" are inadmissible under Rules 602 and 802 of the Federal Rules of Evidence and (2) that a statement made by Motley regarding the alleged motivation for arresting Hart is inadmissible under Rule 602 and in violation of Rule 56(e) of the Federal Rules of Civil Procedure.[7] The district court held that "[b]ecause the disposition of defendant's motion for summary judgment does not turn in any way on the consideration of the disputed evidence, the motion to strike is denied as moot."

---

[7]Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Rule 802 forbids inadmissible hearsay. Rule 56(e) requires affidavits to be "made on personal knowledge [and to] set forth such facts as would be admissible in evidence...."

14

Defendants, however, assert that the district court nevertheless considered both pieces of evidence in denying their motion and allege that the court erred in refusing to strike the evidence from the summary judgment record. While we review the district court's denial of summary judgment on grounds of immunity *de novo,* we review evidentiary rulings for manifest error. *Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194, 195 (5th Cir.1996).

A

Hart testified in her deposition that her neighbor had told Hart that, on the first day of Hart's detention, the neighbor had attempted to arrange for a bail bondsman to bail her out of jail. In addition, Hart testified that Shelly Dodson, a trustee at the Red River County jail, had told her that someone at the jail had informed the bail bondsman that Hart could not be released because of the federal hold. Hart did not offer affidavits or deposition testimony from either her neighbor, Dodson, or the bail bondsman in opposition to defendants' summary judgment motion.

O'Brien and Montana assert that this evidence is inadmissible hearsay. Moreover, they assert that, even though the district court disavowed any reliance on Hart's testimony, the court nonetheless considered the evidence. In support of their assertion, they cite the following statement by the court: "The plaintiff ... contends that her bail was denied because Motley ... falsely told the justice of the peace that a "federal hold' had been placed on Hart's property." However, this statement is not a finding of the district court; it is merely a statement of Hart's claim and

15

theory of the case. Moreover, the district court explicitly set forth the evidence it considered in support of Hart's theory—undisputed evidence that the words "bail denied federal hold" appear on the criminal complaint signed by Motley and the fact, also undisputed by the parties, that there is no such thing as a "federal hold." The court nowhere mentions the challenged hearsay testimony. We therefore find that the district court did not rely on Hart's testimony, even though it did not explicitly strike the evidence from the summary judgment record.

However, insofar as Hart's testimony is relevant to our *de novo* review of defendants' summary judgment motion, we decline to consider it. Hart's testimony concerning what Dodson told her about what a third-party said to a bail bondsman is inadmissible double hearsay under Fed.R.Evid. 801 and 802 and does not otherwise fall within an exception to the hearsay rule.

B

O'Brien and Montana next challenge the following statement offered by Hart in her brief in opposition to summary judgment: "Defendant Former Deputy Motley admits that he may have thought that Plaintiff Hart was taken to jail in an effort to get her to testify against Mr. Conine. In fact, he states that today he might believe that intent was the motivating force behind the decision to have Plaintiff Hart arrested and carried to jail." In her response to the summary judgment motion, Hart cites to the following exchange from Motley's deposition:

Q: Is it your view that Ms. Hart was taken to jail, and that you were told to take her to jail, in an effort to get her to

16

testify on Conine?

A: No.

Q: Have you ever told anybody that?

A: No.

    ...

Q: In fact, isn't it your view that the motivating force behind the decision to have Ms. Hart arrested and carried to jail was to get her to testify against Conine?

A: No.

    ...

Q: Well, you don't remember believing that?

A: I might think that today.

Q: Okay. Well, that's what I'm trying to find out.

A: It wasn't my case.  All I did was transport her.

O'Brien and Montana argue that Motley's statement concerning the other officers' motivation in arresting her is speculative and inadmissible under Fed.R.Evid. 602.

The officers assert that the district court relied on this evidence by pointing to the following statement by the district court:  "Hart's theory of events is essentially that the defendants knew she was not guilty of any illegal activity, but arrested her, filed criminal charges against her, and held her in jail without bail in order to pressure her into providing incriminating information about Conine."  Once again, the district court explicitly set forth the evidence it considered with respect to Hart's theory:  evidence that Montana told her "Your ass is in trouble, you better sing like a bird," Hart's testimony that Motley

17

told her several days after her arrest that he thought she was innocent, and Motley's deposition testimony that he does not recall making such a statement to Hart. The district court did not mention the challenged evidence.

The officers argue that the district court nonetheless relied on the challenged evidence when it determined that "making all inferences in the plaintiff's favor, ... Motley signed a criminal complaint against Hart when he knew she had committed no crime." However, this conclusion is supported by the evidence upon which the district court explicitly stated that it would rely—that is, Hart's testimony that Motley told her he thought she was innocent. We find no evidence that the district court relied on the challenged evidence in denying summary judgment.

Furthermore, we decline to consider Motley's deposition testimony concerning the motivation of the other officers in our *de novo* review of the summary judgment evidence. Under Rule 602, lay witnesses may offer opinion testimony about matters of which they have personal knowledge. *See* Fed.R.Evid. 602. This may include the motivation or intent of another person, if the witness has an adequate basis for his or her opinion, such as personal knowledge or an opportunity to observe the surrounding circumstances. *Hansard v. Pepsi-Cola Metropolitan Bottling Co.,* 865 F.2d 1461, 1466-67 (5th Cir.), *cert. denied,* 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989) (allowing lay witness, "with some hesitancy," to testify concerning motivation for plaintiff's employment termination). *See also John Hancock Mut. Life Ins. Co.,* 585 F.2d

18

1289, 1294 (5th Cir.1978) (allowing witness who observed altercation first hand to testify to victim's belief that his wife would never shoot him); *Bohannon v. Pegelow,* 652 F.2d 729, 732 (7th Cir.1981) (permitting witness who had observed arrest to testify that she believed arrest was motivated by racial prejudice).

In this case, however, the court has no means by which to evaluate the basis for Motley's testimony. Motley did not participate in the investigation or surveillance, was not present until the day of the arrest, and did not participate in the decision to arrest Hart. Motley's deposition testimony does not reveal whether his current belief is based on observations gathered at or around the time of the arrest itself. In short, we have no assurance that Motley has sufficient personal knowledge to draw a reliable conclusion about the officers' motivations. Therefore, we find that Motley's testimony is inadmissible under Rules 602 and 701, and we will not consider the evidence in our review of the district court's denial of summary judgment as to O'Brien and Montana.[8]

V

Starnes alleges that the district court mistakenly decided that he did not have absolute immunity as a matter of law against

---

[8]Motley's opinion may be admitted against him pursuant to Fed.R.Evid. 801(d)(2) as an admission of a party opponent. However, as we discuss below, the officers reasonably believed they had probable cause to detain Hart, and their intent to question her about Conine does not make the arrest actionable under section 1983.

Hart's federal claims.  In making this determination, the district court found that Starnes' "primary role was as a legal advisor to the officers conducting the investigation and executing the search."  Starnes disputes this finding.  We review denial of summary judgment *de novo.  Coleman v. Houston Indep.  Sch. Dist.,* 113 F.3d 528, 533 (5th Cir.1997).  In determining whether a genuine issue of material fact remains on this point, we do not review whether the evidence "could support a finding that particular conduct occurred," *Behrens,* --- U.S. at ----, 116 S.Ct. at 842, but we may "take, as given, the facts that the district court assumed when it denied summary judgment" and determine whether those facts state a claim under clearly established law.  *Cantu v. Rocha,* 77 F.3d 795, 803 (5th Cir.1996).

We normally look to state law to determine the lawfulness of an arrest by a state officer for a state offense.  *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979); *Ker v. California,* 374 U.S. 23, 37-38, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726 (1963) (plurality).  However, in a section 1983 action, a plaintiff alleging unlawful search and arrest by state officers asserts that he was deprived of rights secured by the federal constitution or federal statute.  Therefore, state law governing searches and arrests does not control.  *Fields v. City of S. Houston,* 922 F.2d 1183, 1189-90 & n. 7 (5th Cir.1991).

The Supreme Court has adopted a "functional approach" to the question of absolute immunity, one that looks to "the nature of the function performed, not the identity of the actor who performed

it." *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). A prosecutor is absolutely immune for initiating and pursuing a criminal prosecution. Specifically, a prosecutor is absolutely immune when he acts in his "role as advocate for the State," *Burns v. Reed,* 500 U.S. 478, 491, 111 S.Ct. 1934, 1942, 114 L.Ed.2d 547 (1991) (internal quotation marks omitted), or when his conduct is "intimately associated with the judicial phase of the criminal process." *Id.* at 492, 111 S.Ct. at 1942 (internal quotation marks omitted). However, a prosecutor does not enjoy absolute immunity for acts of investigation or administration. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209 (1993).

A prosecutor has the burden of establishing that he was an "advocate" for each function at issue. *See Burns,* 500 U.S. at 486, 111 S.Ct. at 1939; *see also Buckley,* 509 U.S. at 274, 113 S.Ct. at 2616 ("The question ... is whether the prosecutors have carried their burden of establishing that they were functioning as "advocates' when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot."). Even if a prosecutor fails to show absolute immunity for a given activity, he may still show qualified immunity. *Buckley,* 509 U.S. at 273, 113 S.Ct. at 2615-16.

Hart premises her claims against Starnes on four arguments. First, she alleges that Starnes knowingly or recklessly provided the false information in the warrant affidavit that Hart was married to Stanley Hart, a known drug cultivator. Second, she

21

asserts that Starnes allowed the search and arrest to continue when he knew that the affidavit described the wrong Peggy Hart. Third, she avers that Starnes participated in the decision to place a federal hold on Hart. Fourth, she claims that Starnes went with O'Brien to visit Hart in jail to coerce her into providing information for the case against Conine.

A

Hart's first argument pertains to Starnes' function of providing information for inclusion in an affidavit supporting a warrant. With this function, Starnes acted as a legal adviser to the officers and, much like the officers who participated in the surveillance, an investigator. A prosecutor is not absolutely immune for giving legal advice to the police, *Burns,* 500 U.S. at 496, 111 S.Ct. at 1945, and a prosecutor who acts in the role of a policeman is liable like a policeman if, in so acting, he deprives a plaintiff of rights under the Constitution or federal laws. *Joseph v. Patterson,* 795 F.2d 549, 556 (6th Cir.1986), *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987). Moreover, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley,* 509 U.S. at 274, 113 S.Ct. at 2616. In short, until charges have been filed against an individual, a prosecutor is not absolutely immune for cooperating with law enforcement officers in obtaining a search warrant against that person based on false information. *See Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974) (ruling that prosecutor did not have absolute

22

immunity where defendant alleged that prosecutor had cooperated with police defendants in obtaining a search warrant based on perjured testimony); *see also Barr v. Abrams,* 810 F.2d 358, 361-62 (2d Cir.1987) (ruling that prosecutors were absolutely immune for filing criminal information charging plaintiff with contempt and then applying to court for arrest warrant on that charge); *McSurely v. McClellan,* 697 F.2d 309, 320 (D.C.Cir.1982) (holding that prosecutor was only protected by qualified immunity for preparing pre-indictment search and arrest warrants). Therefore, Starnes does not enjoy absolute immunity from liability arising out of the inaccurate information in the affidavit.

B

Hart's second argument deals with the "function" of preventing an arrest during the execution of a warrant after realizing that information in the affidavit supporting the warrant was inaccurate. "[A] prosecutor who assists, directs or otherwise participates with, the police in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of deciding which suits to bring and ... conducting them in court," and is thus only entitled to qualified immunity. *Marrero v. City of Hialeah,* 625 F.2d 499, 505 (5th Cir.1980) (citation and internal quotations omitted), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); *see also Buckley,* 509 U.S. at 274, 113 S.Ct. at 2616 (noting that a prosecutor is not absolutely immune for planning and executing a raid on a suspected weapons cache).

23

However, Starnes may also enjoy absolute immunity under *Mays v. Sudderth,* 97 F.3d 107 (5th Cir.1996), for his refusal to prevent the search of Hart's home and her arrest during the execution of the warrant. In *Mays,* we held that "an official acting within the scope of his authority is absolutely immune from a suit for damages to the extent that the cause of action arises from his compliance with a facially valid judicial order issued by a court acting within its jurisdiction." *Id.* at 113. In reaching this conclusion, we determined that the common law provided officials with such immunity at the time 42 U.S.C. § 1983 was enacted in 1871. *See Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2912, 57 L.Ed.2d 895 (1978) (holding that to determine if government official is absolutely immune, court must undertake a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it). We relied heavily on a Supreme Court decision, *Erskine v. Hohnbach,* 81 U.S. (14 Wall.) 613, 20 L.Ed. 745 (1871), which referred to absolute immunity for "ministerial officers acting in obedience to process, or orders issued to them by tribunals or officers invested by law with authority to pass upon and determine particular facts, and render judgment thereon...." *Id.* at 616.

In the instant case, the magistrate ordered that the search and arrest warrant be carried out by "the Sheriff or any Peace Officer of Lamar County, Texas or any Peace Officer of the State of Texas." Starnes is not a sheriff or peace officer of Lamar County or the State of Texas, and is not otherwise mentioned in the

24

warrant.  *See* Tex. Penal Code Ann. § 1.07(a)(36) (defining "peace officer");  Tex.Code Crim. Proc. Ann. art. 2.12 (same);  Tex.Code Crim. Pro. Ann. art. 15.01 ("A "warrant of arrest' is a written order from a magistrate directed to a peace officer or some other person specially named, commanding him to take the body of the person accused of an offense....");  *Deltenre v. State,* 808 S.W.2d 97 (Tex.Crim.App.1991) (discussing statutes).  While Starnes was present during the search of Hart's property and her arrest, he was not acting in obedience to the magistrate's commands in the search and arrest warrant;  the warrant was not even addressed to him. Thus, since Starnes was not "comply[ing]" with the warrant, he may not be "clothe[d] ... with the absolute judicial immunity enjoyed by the judge issuing the order."  *Mays,* 97 F.3d at 108.  He participated in the search and seizure at the peril of receiving only qualified immunity.[9]

---

[9]This conclusion not only accords with our earlier decision in *Marrero,* but also with those of other circuits which have addressed the issue.  *See Hummel-Jones v. Strope,* 25 F.3d 647, 653 & n. 10 (8th Cir.1993) (analyzing prosecutor's liability for participation in unreasonable search of birthing clinic under qualified immunity);  *Day v. Morgenthau,* 909 F.2d 75, 78 (2d Cir.1990) (ruling that allegations suggesting that prosecutor may have participated in executing arrest were not covered by absolute immunity);  *Mullinax v. McElhenney,* 817 F.2d 711, 715 (11th Cir.1987) (holding that prosecutors were only qualifiedly immune for their involvement in raid on jail cell);  *Joseph,* 795 F.2d at 556 (holding that "we have no doubt" that prosecutor's participation in search with police of defendant's store that went beyond scope of warrant was not subject to absolute immunity);*McSurely,* 697 F.2d at 319-20 (holding that prosecutor was only entitled to qualified immunity for participating in raid);  *Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir.1978) (holding that prosecutors who helped implement wiretap were not absolutely immune), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979);  *Hampton v. City of Chicago,* 484 F.2d 602, 609 (7th Cir.1973) (holding that prosecutor, who allegedly participated in

25

C

Hart's third contention deals with the function of recommending the denial of bail. This function is intimately associated with the judicial phase of the criminal process, and deals with the initiation and pursuit of criminal prosecution. In carrying it out, a prosecutor is acting as an advocate, rather than as an investigator or administrator, and enjoys absolute immunity against any claims arising out of this function. *See Lerwill v. Joslin,* 712 F.2d 435, 438 (10th Cir.1983) (stating that "a prosecutor's advocacy of a given amount of bail" is entitled to absolute immunity).

D

Finally, Starnes suggests that he is absolutely immune with regard to Hart's claim that he visited her in jail to pressure her to provide information against Conine. However, there is no dispute that, at the time of the visit, ample probable cause existed to arrest and detain Conine. Therefore, assuming Hart's characterization of the visit is correct, Starnes was simply attempting to gather information relevant to his prosecution of Conine. Accordingly, Starnes was acting as an advocate and is absolutely immune from Hart's claim here. *See Hill v. City of New*

the planning and execution of a purportedly illegal raid on apartment, did not warrant absolute immunity any more than the police officers allegedly acting under his direction), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *cf. Pachaly v. City of Lynchburg,* 897 F.2d 723, 727 (4th Cir.1990) (finding that prosecutor was absolutely immune for participating in an allegedly illegal post-indictment search that the prosecutor asserted was necessary to obtain evidence to prosecute the indictment).

*York,* 45 F.3d 653, 662–63 (2d Cir.1995) (noting that prosecutor's interview of witness who allegedly made inculpatory statements about accused would only be investigatory function if prosecutor lacked probable cause to arrest accused and results of interview contributed to his finding of probable cause).

In sum, we find that Starnes is not absolutely immune for allegedly providing inaccurate information for the warrant affidavit, nor for allowing the search and arrest to continue when he knew that the affidavit described a different Peggy Hart; however, we find that he is absolutely immune from the claims that he participated in the decision to place Hart on federal hold and that he tried to coerce Hart into providing information about Conine. As to Hart's first two arguments, Starnes argues that he is immune from suit because of qualified immunity. We consider this claim in our discussion of the qualified immunity claims of the police officers in the next section.

## VI

All the officials, including Starnes, aver that the district court erred in not granting them summary judgment on the grounds of qualified immunity against Hart's federal claims. Generally speaking, qualified immunity protects government officials performing discretionary functions from civil liability under federal law unless their conduct violates a "clearly established [federal] statutory or constitutional right[ ] of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A

27

plaintiff must show that "when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In evaluating an immunity defense to a constitutional claim, the court must first determine whether the plaintiff has alleged the violation of a constitutional right at all. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). We now examine in turn whether O'Brien, Montana, Motley, and Starnes enjoy qualified immunity.

## A

Hart argues that O'Brien violated her Fourth Amendment rights in four different ways, and that he is not entitled to qualified immunity for any of them. First, he submitted the affidavit with the two inaccurate statements to the magistrate and requested the warrant without probable cause; second, he made the original decision to detain Hart; third, he placed Hart on "federal hold;" fourth, he permitted Hart to remain in jail even though he knew that there had not been probable cause to arrest her.

## 1

Hart contends that O'Brien violated her Fourth Amendment rights by submitting an affidavit to the magistrate without probable cause. Subsumed in the qualified immunity inquiry are two other questions involving the reasonableness, if any, of O'Brien's use of the inaccurate statements without further investigation. We will first consider whether O'Brien is immune for including the

inaccurate statements in the affidavit of probable cause. Then we will consider whether he is immune from Hart's claim that he swore to an affidavit and conducted a search without sufficient facts to show probable cause.

Under *Siegert,* we must consider at the threshold whether Hart even alleges a Fourth Amendment violation with regard to the false information claims. 500 U.S. at 232, 111 S.Ct. at 1793. The Supreme Court in *Franks v. Delaware* established that an officer is liable for swearing to false information in an affidavit in support of a search warrant, provided that: (1) the affiant knew the information was false or would have known it was false except for the affiant's reckless disregard for the truth; and (2) the warrant would not establish probable cause without the false information. 438 U.S. at 171, 98 S.Ct. at 2684. Allegations of negligence or innocent mistake are insufficient. *Id.* Therefore Hart's claim that O'Brien was at least reckless in including the inaccurate statements states a valid cause of action under the Fourth Amendment.

Next, we will consider whether O'Brien's sworn statement that Hart lived in Conine's trailer was knowingly false or reckless. O'Brien argues that, based on the surveillance observations, reasonable police officers would agree with the conclusion that Hart was residing in the trailer. Indeed, the officers saw that Hart spent a great deal of time with Conine during the surveillance period. The undisputed facts establish that she went on a trip out of town with Conine and was observed upon her return carrying

29

clothing from the car into the trailer; she was in the trailer at least part of the time during the visit of a known marijuana grower; she performed certain domestic chores in and around the trailer; and she stayed overnight in the trailer at least four times. O'Brien stated in the affidavit for probable cause that the property had been under almost continuous surveillance during the two weeks in question; therefore it is reasonable to assume that Hart spent the other nights during the two-week surveillance away from the trailer.

Hart said that she lived in the white house with black trim during this time. However, since Hart did not own the house, even a reasonable investigation into property records would not have established that Hart lived there. Hart later testified that she did not hold title to the house or surrounding property; she was living there by herself with permission of the owner. More importantly, there is evidence suggesting that a reasonable police officer may have thought that Hart had established a second residence in Conine's trailer. *See United States v. Risse,* 83 F.3d 212, 216 (8th Cir.1996) (rejecting defendant's argument that because officers knew defendant had other residence, they could not have reasonably believed defendant lived at premises searched; "[w]e have found no authority ... that a person can have only one residence for Fourth Amendment purposes."); *Washington v. Simpson,* 806 F.2d 192, 196 (8th Cir.1986) (finding that suspect "resided" at the house, for purposes of entering premises to execute arrest warrant, when she stayed there two to four nights per week, kept

30

certain personal belongings there, and gave that address as residence when booked by police).

We are confident that a reasonably competent officer in O'Brien's position would conclude that Hart resided at the trailer. O'Brien's conclusion was not knowingly inaccurate, and although it was not ineluctable from what he observed, its inclusion in the affidavit was not reckless. Therefore, qualified immunity will protect O'Brien from suit on the basis of this inaccuracy in the affidavit. *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684.

Second, we consider whether O'Brien reasonably relied on Starnes's statement that plaintiff Hart was married to known drug cultivator Stanley Hart. As an initial matter we note that the statement that "Peggy Hart is married to Stanley Hart, who according to DTF files, is a known marihuana cultivator in Red River County, Texas" is technically "true." *A* Peggy Hart *was* married to Stanley Hart. However, it would be absurd to wrest this sentence out of the context of the affidavit. We must interpret affidavits for arrest or search warrants in a commonsense and realistic manner. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). Obviously, this reference to "Peggy Hart [being] married to Stanley Hart" was intended to refer to the "Peggy Hart" in whose car the "unknown white female" was seen driving. And *that* Peggy Hart (who was also the "unknown white female") was the plaintiff, Peggy Nell Hart.

It is theoretically possible that O'Brien may have been able to determine that the statement was inaccurate through additional

31

investigation.  For instance, O'Brien had discovered that a couple of the cars on the property were registered to a Peggy Hart. Perhaps he may have been able to ascertain from public records that the Peggy Hart who lived near Conine was a different person than the Peggy Hart who was married to Stanley Hart. However, the summary judgment evidence adduces no genuine issue that additional investigation would have revealed this mistake.  In addition, the information that Hart was married to Stanley Hart was somewhat in tension with the other information in the affidavit that Hart resided with Conine;  perhaps this information should have prompted additional investigation.  Once again, the summary judgment record leaves us to speculate whether such additional investigation would have been fruitful.  We have reviewed the summary judgment record thoroughly, and conclude that there is no genuine issue that a more extensive investigation would have established that there were two Peggy Harts.

Moreover, it is uncontested that O'Brien obtained the information about Hart being married to Stanley Hart from Starnes after O'Brien had concluded his investigation and as he was preparing his affidavit.  O'Brien testified that, for this reason, he did not independently investigate the accuracy of the information.  A reasonably competent officer might rely without investigation on information from a trustworthy source such as a prosecutor, especially if the prosecutor indicates that the information comes from law enforcement records.  The summary judgment record contains no indication that O'Brien had reason to

believe that there were two Peggy Harts within the county, or that the Peggy Hart that Starnes knew about (who was linked to a known marijuana cultivator) was *different* from the Peggy Hart who owned the cars seen on the property (who was also linked to a different known marijuana cultivator).

Under the circumstances, we find that a reasonably competent police officer would have thought that the statement had sufficient internal indicia of reliability to be included in the affidavit without further investigation (though they would have attributed the statement to Starnes). O'Brien's use of Starnes's statement may or may not have been negligent, but O'Brien was not *reckless* in including it in the affidavit. Therefore he is qualifiedly immune from suit based on this error in the affidavit. *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684.

We turn to the broader issue: whether O'Brien's reasonable belief that Hart resided at the trailer and was married to a known marijuana cultivator, coupled with the other evidence, is sufficient to establish that he reasonably thought that there was probable cause to search Hart's home and arrest her.

The objective standard of *Harlow* applies to claims of unlawful search and arrest such as this, in which the plaintiff alleges that the officer who requested the warrant intentionally or recklessly sought an affidavit without probable cause. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost." *Malley v. Briggs,* 475 U.S. 335,

33

344-45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986) (citation omitted); *see also Anderson,* 483 U.S. at 644-45, 107 S.Ct. at 3041-42 (applying *Malley* to unconstitutional searches). The crucial issue "is whether a reasonably well-trained officer in [the defendant's] position would have known that the affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley,* 475 U.S. at 345, 106 S.Ct. at 1098. The officer "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 S.Ct. at 1096. In other words, there must not even "arguably" be probable cause for the search and arrest for immunity to be lost. *Santiago v. Fenton,* 891 F.2d 373, 386 (1st Cir.1989). Probable cause does not require proof beyond a reasonable doubt, but only a showing of the probability of criminal activity. *United States v. Brown,* 941 F.2d 1300, 1302 (5th Cir.), *cert. denied,* 502 U.S. 1008, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991). A magistrate's findings on the issue of probable cause are entitled to great deference. *Id.*

"Probable cause exists when the facts available at the time of the arrest would support a reasonable person's belief that an offense has been, or is being, committed and that the individual arrested is the guilty party." *Blackwell,* 34 F.3d at 303. Probable cause may exist even though officers have observed no unlawful activity and are unaware of the identity of a defendant.

34

*United States v. Pentado,* 463 F.2d 355, 361 (5th Cir.), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972) *and cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 271 (1973). "The observation of unusual activity for which there is no legitimate, logical explanation can be the basis for probable cause." *United States v. Alexander,* 559 F.2d 1339, 1343 (5th Cir.1977), *cert. denied,* 434 U.S. 1078, 98 S.Ct. 1271, 55 L.Ed.2d 785 (1978).

However, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (citing *Sibron v. New York,* 392 U.S. 40, 62-63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968)). "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.*

The evidence in the affidavit includes the following: (1) Conine "and/or" the "unknown white female" with Hart's physical characteristics have entered the "white frame house with black trim and shutters" (i.e., Hart's house), (2) a couple of Hart's cars are on the property to be searched, (3) the "unknown white female" was seen driving one of Hart's cars, and (4) Conine and the "unknown white female" are "in charge of and controlled" the property. In addition, because we have decided that O'Brien's inclusion of inaccurate statements was not reckless under *Franks,* we must also consider O'Brien's belief that Hart lived in the trailer with

35

Conine and that Hart was married to a known drug cultivator, in determining whether O'Brien reasonably believed probable cause existed.

Some of these statements are not very probative of probable cause. For example, the fact that Hart's house and cars are on the property to be searched is not suspicious, given the fact that her house happened to be near Conine's trailer and she would have been expected to park her cars near her home. The fact that Hart often visited the trailer and sometimes stayed overnight, or the fact that she would sometimes go to Conine's barn, do not establish that she was growing marijuana with Conine. There is no undisputed evidence that she visited the marijuana patches on the property to be searched. Finally, the officials neither saw nor found any evidence of drugs or drug paraphernalia in Hart's home or on her property, the only areas indisputably under her control.

However, from the perspective of the officers, Hart lived smack-dab in the middle of 1,132 marijuana plants, 188 of which were located directly behind her house. She spent a fair amount of time with Conine and in his trailer, and she appeared to reside in the trailer with a suspected (and previously convicted) marijuana cultivator. She also appeared to the officers pursuing the warrant to be married to another marijuana cultivator. She had been present when a known drug cultivator visited Conine, and she had driven with Conine to the gate of the trash dump adjacent to Conine's illicit crops.

It was clear in this case from the presence of the marijuana

crops that a crime was being committed; nevertheless, the evidence connecting Hart to the crime was thin. It is not a crime under federal law or Texas law to maintain a social relationship with a drug cultivator. The question in qualified immunity, however, is not whether the officers actually had probable cause, but rather whether they acted recklessly in swearing a warrant based on the information they possessed. The officers lose their immunity only if it is "obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. In this case, the call on probable cause was very close, and we cannot say that no reasonable officer would have thought he had probable cause to arrest Hart. Our conclusion is bolstered by the fact that the neutral and detached magistrate, faced with the same facts, determined that probable cause existed. This tends to support the reasonableness of the officers' request for the warrant based on their observations.

The officers may have been negligent in their investigation, and wrong to conclude that they had probable cause. However, negligence is insufficient to create liability for police officers under *Malley.* Therefore we find that O'Brien is protected by qualified immunity on this point.

2

Hart alleges that O'Brien violated her constitutional rights by instructing Motley to take her in to the police station without

37

probable cause, even though Montana made the actual decision to take her into custody. Hart's allegations against O'Brien do not state a constitutional claim, because O'Brien and the other officers were directed by the probable cause warrant to arrest Hart. Hart does not contend that the warrant for her arrest was facially invalid, nor that the officers executed the warrant in any way other than that prescribed by the judge. We have stated that police officers acting pursuant to a facially valid judicial warrant enjoy qualified immunity for executing the warrant. *Hamill v. Wright,* 870 F.2d 1032, 1036 (5th Cir.1989). O'Brien was strictly complying with a facially valid judicial order, issued by a court acting within its jurisdiction, and he is therefore entitled to qualified immunity on this claim.[10]

3

Motley testified that O'Brien instructed him to put Hart on federal hold to ensure that she stayed in jail until federal DEA officers could speak to her. The magistrate claims in an affidavit that he does not "recall" there being a federal hold or any discussions about a federal hold, and states that any such hold would not have affected the length of Hart's stay in jail. The magistrate avers that he would have denied bail for a day regardless of whether there was a federal hold because the "investigation scene was still ongoing." However, the sheriff at

---

[10]In addition, O'Brien and the other officers would have been entitled to absolute immunity for executing a facially valid warrant issued by a court of competent jurisdiction. *Mays,* 97 F.3d at 108. However, none of the officers moved for summary judgment on grounds of absolute immunity.

the time and Hart herself have testified that they each believed that the magistrate denied bail because of the federal hold.

The federal hold remained in place for one day. Hart alleges that O'Brien violated due process by causing her to be denied bail by falsely suggesting to the magistrate (through Motley) that there was a federal detainer on her. If a state detainee has an outstanding federal warrant or has been indicted on federal charges, a federal official may place a detainer on the detainee, asking the state to hold him for federal authorities. *Davis v. Attorney General,* 425 F.2d 238, 239 (5th Cir.1970). Presented with a federal detainer, the state may deny the detainee bail, hold him in custody pursuant to state law, and then turn him over to the federal government for prosecution. *Reno v. Koray,* 515 U.S. 50, 62 n. 5, 115 S.Ct. 2021, 2028 n. 5., 132 L.Ed.2d 46 (1995); *United States v. Dovalina,* 711 F.2d 737, 740 (5th Cir.1983).

In this case, no federal detainer existed. Moreover, there was no basis for such a detainer since the federal government had not charged Hart with anything. Motley's explanation for the "federal hold"—that O'Brien wanted to assure that Hart would be available to be interviewed by federal agents—does not justify detention without bail. *See* 18 U.S.C.App. 2 (interstate agreement on detainers); Tex.Code Crim. Pro. Ann. art. 51.14 (same).

However, causation is an element of a section 1983 claim; O'Brien's actions must have actually caused the deprivation of liberty of which Hart complains. *See* 42 U.S.C. § 1983 (providing that a state official is only liable where he "subjects, or causes

39

to be subjected" a person to deprivation of any rights, privileges, or immunities secured by Constitution and laws). The magistrate denied Hart bail on the first day of her detention only; Hart, however, was unable to post bail for over two weeks after her initial confinement. We can reasonably assume, then, that she could not have posted bail one day after her initial confinement had it been set, and thus that the federal hold had no effect on the length of her detention.[11] Therefore, Hart did not suffer any loss of liberty caused by O'Brien's actions. Accordingly, Hart has failed to state a constitutional claim against O'Brien based on denial of bail; *Siegert* therefore dictates that qualified immunity bars this claim as well. 500 U.S. at 232, 111 S.Ct. at 1793.

4

Hart alleges that O'Brien is responsible for damages stemming from her two-week detention because he did not disclose "patently exculpatory evidence" to the prosecutor, namely his alleged knowledge that there was no probable cause for her arrest. Police detainer, even of one innocent of any wrongdoing, pursuant to a valid warrant does not give rise to a constitutional claim. *Baker v. McCollan,* 443 U.S. 137, 143-44, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979) (holding that police detainer of misidentified suspect for three days, pursuant to a valid warrant, does not state a claim under section 1983). However, a plaintiff states a section 1983

_____

[11]Given that the magistrate later set bail at $50,000, Hart cannot reasonably claim that the magistrate would have released her on her own recognizance on the first day of her detention absent O'Brien's alleged misconduct.

claim against a police officer who, after learning of "patently exculpatory evidence," deliberately fails to disclose it to the prosecutor. *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir.1992). Such deliberate concealment can be the basis for an inference that a defendant police officer maliciously initiated and maintained a prosecution. *Id.* at 1163.

In *Sanders,* a police lieutenant arrested a robbery suspect after a victim identified him. *Id.* at 1156. In the days immediately following the arrest, several people brought exculpatory evidence to the lieutenant's attention: people told the officer, for example, that the victim and Sanders (the arrestee) were related, calling into question the victim's inability to identify Sanders until several days after the crime in an informal lineup; an eyewitness who had helped police artists compose a sketch of the suspect told the officer that Sanders was the wrong person; other victims of the same assailant were unable to identify Sanders as their assailant; and a few days after the arrest, the lieutenant learned that Sanders had a credible alibi supported by three witnesses. *Id.* Faced with all of this evidence showing that Sanders was not the robber, the police lieutenant "deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man...."

There is no similar exculpatory evidence in the instant case. Hart alleges that O'Brien knew there was no probable cause to arrest her, but refused to notify prosecutors of this fact. Hart cites O'Brien's later deposition in which he testified that "the

41

target of the investigation was Mr. Conine. And Mr. Conine's property.... We wasn't [sic] going down there to try to arrest [Hart] and send her to the penitentiary. We was [sic] after Mr. Conine, his property, and his weed, we believed to be his marijuana." In addition, O'Brien admitted that he visited Hart in jail to encourage her to provide information against Conine. None of this constitutes "patently exculpatory evidence," however, because it does not tend to show that Hart was not guilty.

Even if Conine was the primary target of the investigation and Hart's arrest were merely pretextual, the lawfulness of Hart's arrest does not depend on the actual motivations of the arresting officers. *Whren v. United States,* --- U.S. ----, ----, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (holding that the proper focus of Fourth Amendment inquiry is objective conduct, and not subjective intent, of police officer); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523(1987) (noting that malignant motive of officers is irrelevant under *Harlow* test to question of qualified immunity); *United States v. Causey,* 834 F.2d 1179 (5th Cir.1987) (en banc) (holding that pretextual arrest did not violate Fourth Amendment where arrest was objectively supported by probable cause).

In addition, this case presents facts almost opposite of *Sanders.* O'Brien and the other officers at this point knew that Hart had spent much time in Conine's trailer, and that the trailer was littered with drugs, drug paraphernalia, and cash. After they arrested her, they certainly had some evidence that Hart knew about

42

Conine's illicit activities. This evidence is inculpatory, not exculpatory, and further supports the officers' decision to keep Hart in jail. We therefore find that O'Brien was immune from suit for illegal detention as well.

In sum, O'Brien enjoys qualified immunity from suit for intentionally or recklessly including incorrect statements in the affidavit, for his instruction to other officers to arrest Hart, for pursuing the warrant, for illegal detention, and for recommending that Hart be held pursuant to a federal hold.

B

Hart claims that Montana and Motley violated her Fourth Amendment rights—Montana by instructing Motley to take her into custody, and Motley by taking her to jail. She also claims that both are liable for their participation in the discussion and decision to impose a federal hold, and for deliberately withholding exculpatory information from the prosecutor.

As suggested above, Montana and Motley are qualifiedly immune for the decision to arrest Hart and for taking her to jail, because they were acting pursuant to a facially valid warrant issued by a court of competent jurisdiction. *Hamill,* 870 F.2d at 1036. There is some proof that, shortly after Hart's arrest, Montana told her something to the effect that her "ass is in a world of trouble" and she needed to "sing like a bird" against Conine, suggesting that Montana kept Hart detained *only* to elicit evidence against Conine. There is also some evidence that Motley heard these statements.

The question of whether the officers had probable cause to

43

keep Hart incarcerated is different from the question of whether they had probable cause to arrest her. Nonetheless, just as in the context of Hart's claims against O'Brien, we find that Hart does not state a claim for illegal detention. Montana withheld no exculpatory evidence from the prosecutor, and he had a reasonable belief that there was probable cause to detain her, pursuant to a facially valid warrant. Therefore, the fact that he wanted to question her about Conine is not, in itself, actionable under section 1983. Furthermore, as suggested above, even construing the facts in the light most favorable to Hart, Montana's and Motley's participation in imposing a "federal hold" does not amount to a constitutional violation. Hart did not suffer any loss of liberty caused by their actions.

Therefore, Montana and Motley are entitled to qualified immunity on all of Hart's allegations against them.

C

Starnes's claim to qualified immunity is on slightly different footing because he is not a police officer. In section V, we held that Starnes was absolutely immune from Hart's claims that he participated in the decision to place her on "federal hold" and that he tried to persuade her to provide information about Conine. We now consider whether Starnes is qualifiedly immune from Hart's claims stemming from the fact that he provided inaccurate information for the warrant affidavit (i.e., the statement about Hart being married to Stanley Hart, a known marijuana cultivator) and from the fact that, even after realizing that this information

44

was incorrect, he refused to stop Hart's arrest.

1

Under *Siegert,* we must consider at the threshold whether Hart even alleges a Fourth Amendment violation with regard to the false information claim. 500 U.S. at 232, 111 S.Ct. at 1793. The Supreme Court in *Franks v. Delaware* established that a search violates the Fourth Amendment if it was conducted pursuant to a warrant issued by a magistrate who was misled by information in an affidavit, provided that the affiant knew the information was false or would have known it was false except for his reckless disregard for the truth. 438 U.S. at 171, 98 S.Ct. at 2684. However, Starnes is not the affiant in this case, and, taken at face value, *Franks* applies only to officers who sign a warrant affidavit or otherwise request a warrant under oath: "[t]he deliberate falsity or reckless disregard whose impeachment is permitted is only that of the affiant, not of any nongovernmental informant." *Id.*

However, we need not take *Franks* only at face value. The Court left open the possibility that a search or arrest violates the Fourth Amendment where the affiant relies in good faith on deliberate or reckless misstatements by another governmental official in establishing probable cause. *See id.* at 164 n. 6, 98 S.Ct. at 2680 ("[P]olice [can] not insulate one officer's deliberate misstatements merely by relaying it through an officer-affiant personally ignorant of its falsity."). Several circuits have held that a deliberate or reckless misstatement or omission by a governmental official who is not the affiant may

45

nevertheless form the basis of a *Franks* claim. *United States v. Wapnick,* 60 F.3d 948, 956 (2d Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996); *United States v. DeLeon,* 979 F.2d 761, 764 (9th Cir.1992); *United States v. Calisto,* 838 F.2d 711, 714 (3d Cir.1988); *United States v. Pritchard,* 745 F.2d 1112, 1118 (7th Cir.1984); *cf. Hale v. Fish,* 899 F.2d 390, 401 (5th Cir.1990) (applying *Franks* test to officer who did not sign or draft affidavit but whose presence at time of warrant tended to influence judge issuing warrant).

We agree with the reasoning of these circuit courts that a deliberate or reckless misstatement may form the basis for a *Franks* claim against a government official who is not the affiant. "The Fourth Amendment places restrictions and qualifications on the actions of the government generally, not merely on affiants." *DeLeon,* 979 F.2d at 764. A governmental official violates the Fourth Amendment when he deliberately or recklessly provides false, material information for use in an affidavit in support of a search warrant, regardless of whether he signs the affidavit.

Although Starnes did not sign the affidavit and was not present when O'Brien requested the warrant from the magistrate, Starnes helped to draft the affidavit and admits he was the exclusive source of the inaccurate information about Peggy Hart's marital status. Hart alleges that Starnes provided the false information intentionally or recklessly. Therefore, Hart has stated a claim for violation of her Fourth Amendment rights under *Siegert.*

46

The issue, then, becomes whether Starnes can demonstrate that he did not violate any of Hart's clearly established Fourth Amendment rights. Hart's arrest would violate the Fourth Amendment if Starnes intentionally or recklessly included false information in the affidavit and this information was necessary for probable cause. Starnes provided the inaccurate information in the affidavit about Hart being married to Stanley Hart, and he realized that this information was incorrect the day of the raid. However, there is no evidence that Starnes knew the information was inaccurate before giving it to O'Brien to include in the affidavit.[12] Therefore, there is no genuine issue that he intentionally provided false information for inclusion in the affidavit.

The question remains whether Starnes exhibited a reckless disregard for the truth in providing the information. *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684. To prove reckless disregard for the truth, Hart must present evidence that Starnes "in fact entertained serious doubts as to the truth" of the statement that she was the Peggy Hart married to Stanley Hart. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (setting forth

---

[12]Starnes later testified that Stanley Hart told him sometime prior to the raid that he had been a marijuana cultivator but had since stopped. Starnes also testified that, sometime prior to the raid, the Peggy Hart married to Stanley Hart informed him that Stanley had become a drug counselor. However, the fact that Starnes had reason to believe that Stanley Hart had stopped growing marijuana does not impugn the truthfulness of his statement that Stanley Hart is someone known to have cultivated marijuana, nor would it have established doubt in Starnes's mind that the Peggy Hart married to Stanley Hart was not the Peggy Hart who owned the vehicles parked on or near Conine's property.

standard for reckless disregard of truth in libel cases); *see also United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 1355, 84 L.Ed.2d 377 (1985) (adopting First Amendment standard for recklessness in *Franks* context); *United States v. Tomblin,* 46 F.3d 1369, 1388 (5th Cir.1995) (citing recklessness standard in *Williams* with approval). There is some evidence in the record that Starnes knew the other Peggy Hart, who worked at the Lamar County courthouse. However, there is no evidence that Starnes had any reason to believe that there might be two Peggy Harts within this rural community so as to raise serious doubts as to the accuracy of his statements to O'Brien.

Perhaps there are steps Starnes might have taken to verify the information he provided, however, the summary judgment record does not disclose what these might be, nor that they would actually show the information to be inaccurate. Starnes is entitled to qualified immunity on Hart's first claim.

2

Hart also claims that Starnes violated her constitutional rights by failing to act at the arrest scene once he had seen her and realized that some of the information supporting the warrant was inaccurate. Starnes has admitted that he knew shortly before Hart was arrested that the statement in the affidavit about Hart being married to a known marijuana cultivator was incorrect, but that he did not so inform the officers. Hart alleges that Starnes had a duty to inform the police officers that the arrest warrant

48

was based on inaccurate information and a duty to stop execution of the warrant.

Even assuming such a duty exists, however, Starnes did not violate any of Hart's clearly established Fourth Amendment rights at the time of her arrest. Law enforcement officers may have a duty to discontinue an arrest upon discovery that information contained in a warrant is incorrect if it is material. *Cf. Maryland v. Garrison,* 480 U.S. 79, 87, 107 S.Ct. 1013, 1018, 94 L.Ed.2d 72 (1987) (once officers were on notice of a risk that apartment they were searching was erroneously included within terms of warrant, they were required to withdraw and discontinue search); *United States v. Marin-Buitrago,* 734 F.2d 889, 894 (2d Cir.1984) (when definite and material change has occurred in facts underlying magistrate's determination of probable cause, officers must report new and correcting information to magistrate before acting on warrant). However, we can find no controlling case law that establishes a constitutional duty on a prosecutor tagging along on a search to inform law enforcement officers of his doubts that the warrant should be executed as written. Therefore, under *Harlow,* Starnes is qualifiedly immune against Hart's failure-to-inform allegation.

VII

Next, O'Brien and Montana argue that the district court erred in determining that they did not have official immunity against Hart's state-law claims. Starnes, Motley, and Myrick did *not* assert official immunity defenses to Hart's state law claims;

49

therefore we consider the defenses only as to O'Brien and Montana. The state-law claims include false imprisonment, malicious prosecution, and intentional infliction of emotional distress.[13] We review district court determinations of state law *de novo. Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

The Texas Supreme Court has stated that government employees are entitled to official immunity from suit arising from performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994). Official immunity in Texas is substantially the same as qualified immunity under federal law. *Id.* at 656. One important difference, however, is that official immunity does not incorporate the requirement that the plaintiff show the violation of a clearly established right. Rather, official immunity hinges on whether the official's activities were undertaken in "good faith," that is, whether they were objectively reasonable. *Id.* at 656-67.

The district court determined that the officers were acting within the scope of their authority, but that fact issues remained as to whether they were exercising their duties in good faith. The district court also apparently assumed that the officers were all

---

[13]The district court also denied the officials summary judgment on the ground that triable issues of fact remained regarding certain elements of the torts. Although the officials challenge that decision and both sides have briefed the issues, we may not entertain these arguments in the instant interlocutory appeal. *Johnson v. Jones,* 515 U.S. 304, 314, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995).

50

exercising discretionary duties, and Hart does not argue otherwise in this appeal. We consider each of Hart's state-law causes of action in turn, examining the officers' good faith in each.

A

Hart maintains that, under Texas law, O'Brien and Montana are liable for falsely imprisoning her. She alleges that O'Brien instructed Myrick to arrest her, coordinated the federal hold, and did nothing to prevent her two-week detention. She further avers that Montana is liable for making the final decision to arrest her and for discussing the federal hold with the others.

To establish false imprisonment, Hart must prove that O'Brien, and Montana willfully detained her without her consent and without authority of law. *James v. Brown,* 637 S.W.2d 914, 918 (Tex.1982). As a general matter, liability extends to anyone who participates in the unlawful detention or who directs or requests the detention. *Cronen v. Nix,* 611 S.W.2d 651, 653 (Tex.Civ.App.1980, writ ref'd n.r.e.), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 112 (1981). However, "[i]f an arrest or detention is executed under process which is legally sufficient in form and duly issued by a court of competent jurisdiction, an action for false imprisonment will not lie." *Id.* There is no dispute that the warrant was facially valid and was issued by a court with competent jurisdiction. Therefore, Hart cannot charge the officers who executed the warrant with false imprisonment. *See Emerson v. Borland,* 927 S.W.2d 709, 720 (Tex.App.1996, writ denied) (plaintiff arrested pursuant to facially valid warrant and

51

imprisoned for five days could not allege false imprisonment on the basis that probable cause did not exist to issue warrant).

In short, because the officers were acting pursuant to a facially valid warrant, they could reasonably entertain a good faith belief that their execution of the warrant was consistent with Hart's rights. *See Cantu,* 77 F.3d at 810 (when allegations fail to state a claim as a matter of state law, officer is entitled to immunity). Therefore the officers enjoy official immunity against this allegation.

B

By contrast, the issuance of a valid warrant will not shield the officers from liability for malicious prosecution; indeed it is conformity to valid process that separates the two causes of action. As the Texas Supreme Court established long ago, arrests *without* authority may be remedied by a claim for false imprisonment, but any alleged wrongs committed by officers pursuant to lawful process must be vindicated under a theory of malicious prosecution. *Hubbard v. Lord,* 59 Tex. 384, 386 (Tex.1883) ("Where the arrest is without authority, ..., [the court] may proceed here as upon the same allegations and against the same parties as at common law in the action of false imprisonment. Where the arrest is made under lawful process, we must proceed alone against the party who sued it out, and must allege malice and want of probable cause.").

Hart asserts that O'Brien is liable for malicious prosecution for including the two inaccurate statements in the affidavit of

52

probable cause, and that both officers are liable for the decision to arrest her, for instigating the "federal hold," and for their failure to provide exculpatory information to Starnes.

To prove malicious prosecution, a plaintiff must show: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.,* --- S.W.2d ----, ----, No. 95-0692, 1997 WL 378134 at *2 (Tex. July 9, 1997).

The district court denied O'Brien and Montana summary judgment on official immunity, holding that, because issues of fact remained contested, it could not decide the issue on summary judgment. Just as in the context of false imprisonment, if Hart fails to state a claim for malicious prosecution, O'Brien and Montana are necessarily entitled to official immunity under Texas law, because the officers could reasonably believe that their actions were consistent with Hart's rights. *Cantu,* 77 F.3d at 810.

The inclusion of inaccurate statements in a warrant for probable cause and the failure to produce exculpatory evidence do not state a claim for malicious prosecution under state law. As we held in the qualified immunity analysis, O'Brien did not include the inaccurate statements intentionally or recklessly, and therefore as a matter of law, Hart cannot show malice as required.

53

Furthermore, consistent with this analysis, we find that O'Brien was acting in good faith, affording him official immunity. Moreover, as we also discussed in the qualified immunity section of this opinion, the officers reasonably believed they had probable cause to detain Hart, and her assertions that the officers should have informed Starnes that they did not have probable cause do not constitute exculpatory information.

O'Brien and Montana similarly are officially immune for the decision to arrest Hart, because Hart has not shown the absence of probable cause. "The probable-cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Richey,* --- S.W.2d at ----, 1997 WL 378134 at *2; *see also Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983) (same), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). We have held in our analysis of the officers' federal qualified immunity that the officers reasonably believed they had probable cause to proceed against Hart. Therefore Hart cannot assert a claim for malicious prosecution against them for their decision to arrest her.

Hart's further assertion, that the officers are liable under a malicious prosecution theory for placing her on federal hold, and therefore denying her bail, is similarly unavailing. Bail is simply the security given by an accused to ensure that she will appear in court and answer the accusation brought against her. Tex.Crim. Pro. Ann. Art. 17.01. Recommending the denial of bail

54

does not "continue" judicial proceedings; such proceedings persist regardless of whether the court grants or denies a defendant bail. Furthermore, we note that the magistrate set bail at $50,000 the day after the federal hold, and Hart could not post this amount for about two weeks. Thus, the federal hold cannot even be said to have prolonged her detention. On this claim she both has failed to show commencement or continuation of proceedings caused by the officers' actions, and has failed to show damages. Therefore O'Brien and Montana are entitled to official immunity for malicious prosecution as a matter of law.

C

Hart alleges that O'Brien and Montana intentionally inflicted emotional distress on her.[14] Under Texas law, intentional infliction of emotional distress has four elements: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Mattix-Hill v. Reck,* 923 S.W.2d 596, 597 (Tex.1996). A court should find liability for outrageous conduct "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all

---

[14]The district court granted Myrick summary judgment on the merits for Hart's intentional infliction claim, and that ruling is not on appeal here. Although Motley, Myrick, and Starnes alluded to a defense of official immunity in their motion for summary judgment on Hart's intentional infliction claim, the district court did not rule on the motion and none of the three raises the defense on appeal. Motley, Myrick, and Starnes did not assert official immunity defenses to either of the other state law claims, either before the district court or on appeal.

55

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (citation and internal quotation marks omitted). "Liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions." *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir.1993) (applying Texas law) (internal quotation marks omitted). Moreover, to recover damages for this tort, the emotional distress the defendant inflicts must be unreasonable under the circumstances and "so severe that no reasonable man could be expected to endure it." *Motsenbocker v. Potts,* 863 S.W.2d 126, 132 (Tex.App.1993, no writ).

Hart's allegations that O'Brien and Montana's decisions to arrest her intentionally inflicted emotional distress do not state a claim because the warrant commanded them to arrest her. Conduct that is required or authorized by law cannot be extreme or outrageous. *Reck v. Londow,* 926 S.W.2d 589, 593 (Tex.App.1995), *judgm't rev'd in part on other grounds,* 923 S.W.2d 596 (Tex.1996). Therefore Hart fails to state a claim on this count, and the officers are officially immune from suit for deciding to arrest Hart. *Cantu,* 77 F.3d at 810.

Moreover, Hart fails to state a claim against O'Brien and Montana with regard to the federal hold. The hold lasted only one day, and Hart remained in detention for two weeks after the hold was lifted because she could not meet bail, which had been set at $50,000. Thus, at most, any distress caused by the hold (as opposed to her arrest or pretrial detention) would have stemmed

56

from her loss of *opportunity* to post bail a day earlier or, alternatively, from the possible involvement of federal (as opposed to state) officials in her case. We determine, as a matter of law, that such alleged distress is not severe. Thus, O'Brien and Montana enjoy official immunity from Hart's claim regarding the federal hold.

Finally, we hold that Hart may not state a claim for intentional infliction of emotional distress based on her allegations that O'Brien and Montana arranged for her arrest without probable cause. To state a claim for intentional infliction of emotional distress, the plaintiff must show that the defendant acted intentionally or recklessly. As we have established, there is no genuine issue suggesting that the officers did not reasonably believe they had probable cause to seek a warrant from the magistrate judge, or that they acted unreasonably in executing the warrant. Therefore, Hart fails to state a claim that the officers intentionally inflicted emotional distress, and the officers are officially immune on this score as well. *See also Halbert v. City of Sherman, Tex.,* 33 F.3d 526, 529 (5th Cir.1994) (holding that even falsely informing police that someone is using drugs is not sufficiently outrageous conduct to warrant recovery of damages for intentional infliction of emotional distress).

Therefore we find that the officers are officially immune from suit under any theory of intentional infliction of emotional distress.

VIII

57

This is a complex, multiple-defendant, multiple-theory case. We briefly summarize the state of the claims for the sake of clarity. Hart sued the defendants under five theories: two federal claims that the arrest and search were a violation of her constitutional rights, and three state claims for false imprisonment, malicious prosecution, and intentional infliction of emotional distress. First, as to Hart's federal section 1983 claims: the district court granted summary judgment to Myrick and Red River County on both federal claims. We have dismissed all the remaining federal claims, against all defendants, on grounds of qualified immunity (and absolute immunity for some of Starnes's actions). Next, as to her state claims, the district court granted summary judgment to Red River County on all claims, and to Myrick on the intentional infliction count. In addition, we have held that O'Brien and Montana are entitled to official immunity for all three claims.

Therefore, Hart has live causes of action in state law only, asserting false imprisonment against Motley, Myrick, and Starnes; asserting malicious prosecution against Motley and Starnes (Hart did not sue Myrick on this theory); and asserting intentional infliction against Motley and Starnes.

IX

This case illustrates the difference, as a matter of law, between simple negligence and recklessness. The officials in this case certainly made mistakes, but we conclude that there is no issue of material fact demonstrating that they acted intentionally

58

or recklessly. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096 (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). Starnes did not slander Hart, but provided seemingly reliable (although ultimately erroneous) information from Drug Task Force files. Even though the evidence connecting Hart to the crime was thin, the officers reasonably could have believed that they had enough to establish probable cause. In addition, they did exactly what they were supposed to do with the information: they took their evidence to a magistrate judge, who held that they had probable cause for arrest. The officers conducted searches and arrests only where they had a valid warrant.

Qualified and official immunities protect police officers in the "gray area" between absolute certainty on the one hand and reckless or wanton conduct on the other. In the regular course of police work, this gray area can cover a wide range of reasonable conduct. Viewed *ex post,* it is easy to criticize some of the officers' actions; however, for purposes of immunity, we must evaluate their actions given what they knew when they acted. At the very least, we think that the officers and Starnes did not act recklessly in this case.

We REVERSE the district court's judgments on absolute immunity as to Starnes, REVERSE the district court's holdings on qualified immunity as to all defendants, and REVERSE the district court's holdings on official immunity as to O'Brien and Montana. We RENDER summary judgment in favor of O'Brien and Montana on all counts, and

59

in favor of Motley and Starnes on Hart's federal claims.

BENAVIDES, Circuit Judge, concurring in part and dissenting in part:

I join the portions of the majority's opinion that are not derived from a finding that the warrant issued for Hart's arrest and the search of her property was substantively valid. As a result, I join parts IV and V of the majority's opinion, which resolve the evidence admissibility and absolute immunity issues presented in this appeal. Moreover, because Motley was not involved in the surveillance of Conine's property nor the preparation of the warrant application, I join the majority's holding that he is entitled to qualified immunity because of his reliance on a seemingly facially valid warrant. Further, because I agree with the majority's finding that Hart failed to show that the placement of the false federal hold on her criminal complaint caused her to be detained in violation of the Fourth Amendment and maliciously prosecuted, I join the discrete portions of its opinion holding that O'Brien, Montana, and Motley were entitled to summary judgment on these claims.

I write separately, however, because I cannot agree with the majority's assertion of jurisdiction over the portions of the interlocutory appeals of defendants O'Brien, Montana, and Starnes challenging the district court's determination that Hart's evidence raised a genuine issue of material fact regarding the validity of the warrant. This sufficiency of the evidence finding is not immediately appealable under the collateral order doctrine because it does not conclusively determine a claim of right that is

separable from the Fourth Amendment rights asserted in Hart's action. *See Mitchell v. Forsyth,* 472 U.S. 511, 524, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985) (quoting *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949)). The majority's analysis of the immunity[1] claims of these three defendants, moreover, is entirely predicated on its initial and extra-jurisdictional finding that O'Brien and Starnes did not violate Hart's Fourth Amendment rights by knowingly or recklessly including false statements in the probable cause affidavit. Because the majority acknowledges that the existence of immunity for O'Brien, Montana, and Starnes is conditioned on this finding, I dissent from the portions of its opinion holding that these three defendants are entitled to immunity as a matter of law.

In her complaint, Hart asserted that O'Brien and Starnes violated her Fourth Amendment rights, in part because they intentionally or recklessly included false statements in the probable cause affidavit submitted in support of the warrant for her arrest and the search of her residence. After discovery, O'Brien, Montana, and Starnes moved for summary judgment. They argued that each of Hart's claims was dependent on a finding that the warrant was invalid and that she did not produce sufficient evidence to raise a genuine issue of material fact as to whether these false statements were intentionally or recklessly included in

---

[1]Because the standards for immunity under federal and Texas law are quite similar, I will simply use the term "immunity" to refer to "qualified immunity" under federal law and "official immunity" under Texas law.

61

the affidavit. In addition, they asserted that they were entitled to immunity. The district court denied these motions and explicitly found that "the plaintiff has raised a genuine issue of material fact as to whether these two false statements were included knowingly or with reckless disregard for their truth and veracity."

In its statement of jurisdiction, the majority appears to recognize that this finding may not be reviewed on interlocutory appeal, for it correctly notes that when a "district court denies summary judgment on the grounds that material facts exist which a party may or may not be able to prove at trial, the official must await final judgment before appealing." *Maj. op.* at 12; *Behrens v. Pelletier,* --- U.S. ----, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996); *Johnson v. Jones,* 515 U.S. 304, 305, 115 S.Ct. 2151, 2153, 132 L.Ed.2d 238 (1995). A public official who attacks a plaintiff's ability to prove her case is not raising a qualified immunity defense, which is "conceptually distinct from the merits of the plaintiff's claim.' " *Jones,* 515 U.S. at 314, 115 S.Ct. at 2157 (quoting *Mitchell,* 472 U.S. at 527, 105 S.Ct. at 2816). Instead, that official is arguing that "the evidence [cannot] support a finding that particular conduct occurred," and this argument "is not truly "separable' from the plaintiff's claim." *Behrens,* --- U.S. at ----, 116 S.Ct. at 842. A court of appeals, therefore, may not review a sufficiency determination on interlocutory appeal because "there is no "final decision' under [the collateral order doctrine as defined by] Cohen and Mitchell."

62

*Id.; Jones,* 515 U.S. at 314, 115 S.Ct. at 2157.

The majority, however, begins its qualified immunity analysis by "consider[ing] whether O'Brien's sworn statement that Hart lived in Conine's trailer was knowingly false or reckless," and "whether Starnes exhibited a reckless disregard for the truth in providing the [false] information" regarding Hart's marital status. *Maj. op.* at 570, 578. Further, after thoroughly reviewing the record below, the majority disagrees with the district court's view of the conflicting evidence and concludes that O'Brien and Starnes did not intentionally or recklessly include the false statements in the probable cause affidavit. There can be no question that the majority's finding that the summary judgment evidence fails to create a genuine issue of material fact is improper and extra-jurisdictional under the Court's decisions in *Johnson* and *Behrens.*

In order to review immediately the appeals of O'Brien, Montana, and Starnes insofar as they challenge the district court's finding of a genuine issue of material fact, the majority appears to create a new principle of interlocutory jurisdiction. Under this principle, a court of appeals may exercise interlocutory jurisdiction over a district court's finding of a genuine issue of material fact if any of the evidence relating to that finding is undisputed. *Maj. op.* at 563 (stating that "enough uncontested facts exist to determine that [these three defendants] are immune as a matter of law"), 569-72 (minimizing Hart's favorable evidence and independently reviewing the "undisputed facts" relating to the

63

district court's determination that a genuine issue of material fact existed regarding O'Brien's *mens rea* when he included the false statements in the affidavit), 577-78 (understating Hart's favorable evidence and independently reviewing the evidence relating to Starnes' state of mind when he provided O'Brien with the information about Hart). The majority's indiscriminate reliance on the existence of undisputed evidence to justify its exercise of interlocutory jurisdiction, however, violates the collateral order doctrine.

Under the collateral order doctrine, a defendant may argue on interlocutory appeal that even if the disputed facts are viewed in the plaintiff's favor, the remaining undisputed facts demonstrate that the plaintiff's constitutional rights were not violated or that the defendant's conduct was objectively reasonable in light of clearly established law. *Behrens,* --- U.S. at ----, 116 S.Ct. at 842; *Naylor v. Louisiana,* 123 F.3d 855, 856 (5th Cir.1997); *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 531 (5th Cir.1997).[2] This is because the question for interlocutory

_____

[2]In this case, however, there was no evidence in the probable cause affidavit, aside from the false statements, linking Hart to any crime. Thus, O'Brien, Montana, and Starnes cannot argue on interlocutory appeal that the undisputed facts show that Hart's Fourth Amendment rights were not violated because the affidavit's remaining content revealed the existence of probable cause. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Further, the absence of such additional evidence explains why the majority must find that these false statements were properly included in the warrant application in order to find that the conduct of these three defendants was objectively reasonable. Of course, had the district court been presented with an affidavit containing both the false statements as well as other undisputed evidence allegedly providing probable cause, a finding that the undisputed facts did not establish probable cause nor justify a

64

review—the existence of immunity—is a purely legal question that is separable from the merits of a plaintiff's claim. *Jones,* 515 U.S. at 314, 115 S.Ct. at 2157. The majority, however, relies on the presence of undisputed facts to justify its interlocutory review of Hart's compliance with her burden of production, an issue that the Supreme Court has found to be inextricably intertwined with, rather than separate from, the merits of her claims. *Id.* Thus, the existence of undisputed evidence pertaining to the district court's finding of a genuine issue of material fact does not transform that determination into one that is immediately appealable under the collateral order doctrine.

The majority, moreover, necessarily relies on its extra-jurisdictional conclusion that the false statements were properly included in the probable cause affidavit in order to award O'Brien, Montana, and Starnes immunity on the remainder of Hart's claims. To begin with, the majority finds that these statements provided probable cause for the arrest of Hart and the search of her residence. The presence of probable cause, moreover, disposes of several of Hart's Fourth Amendment and state law claims. Further, by including these statements within the probable cause affidavit, the majority transforms a warrant of questionable validity into a "facially valid" warrant, *maj. op.* at 576, 579-80, that can be relied on by the very people who may have intentionally or recklessly provided the issuing magistrate with false

---

reasonable belief in its existence would have been reviewable on interlocutory appeal.

65

information. This then eliminates Hart's remaining Fourth Amendment and state law claims.[3] Thus, solely by virtue of its improper exercise of jurisdiction, the majority is able to immunize O'Brien, Montana, and Starnes with respect to each of Hart's claims before us on appeal.

For the foregoing reasons, I respectfully DISSENT from the portions of the majority's opinion holding that O'Brien, Montana, and Starnes are entitled to qualified immunity as a matter of law. I would instead dismiss for lack of jurisdiction the portions of the appeals of these three defendants challenging the district court's finding that Hart met her burden of production regarding the validity of the warrant under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

---

[3]This principle of immunity, however, cannot dispose of the claims against Montana. Montana, like O'Brien, participated in the surveillance of Conine and Hart that provided the factual basis for a finding of probable cause. Thus, because there is a factual dispute as to whether O'Brien, given his knowledge, intentionally or recklessly included false statements in the probable cause affidavit, it is an open question whether Montana, who possessed the same knowledge, could reasonably have relied on the warrant issued on the basis of this affidavit.