**ENGINE MANUFACTURERS ASSOCIATION, et al.,**
Plaintiffs

v.

**Robert J. HUSTON, et al., Defendants**

**No. A 00 CA 316 SS.**

United States District Court,
W.D. Texas,
Austin Division.

June 13, 2001.

---

**8.** *Hanson Production* involved a claim of property damage. *See Hanson Production,* 108 F.3d at 628.

John F. Morehead, Austin, TX, Timothy A. French, Jed R. Mandel, Neal, Gerber & Eisenberg, Chicago, IL, for Plaintiffs.

Anthony W. Benedict, Atty. General's Office Natural Resources Div., Austin, TX, Brian Edward Berwick, Austin, TX, for Defendants.

## *ORDER*

SPARKS, District Judge.

BE IT REMEMBERED on this the 13th day of June 2001, the Court reviewed the file in the above captioned matter. Before the Court are plaintiff-intervenor American Road & Transportation Builders Association's ("ARTBA") Motion for Summary Judgment [# 41], plaintiff-intervenor Air Transport Association of America's ("ATA") Motion for Summary Judgment

[# 43], plaintiff Engine Manufacturer Association's ("EMA") Motion for Summary Judgment [# 48], defendants' Motion for Summary Judgment with Respect to EMA and ARTBA [# 53], defendants' Motion for Summary Judgment with Respect to EMA and ATA [# 55], and defendants' Motion for Summary Judgment on the standing of EMA [# 59]. On November 17, 2000, the Court held a hearing at which parties were ably represented by counsel, and invited counsel's letter briefs on issues raised at the hearing. On March 2, 2001, the Court granted the parties' Joint Motion to Stay [# 86], which governed all claims and causes of action asserted by the ATA and Count One of the EMA complaint, until August 30, 2001. On April 18, 2001, EMA filed a status report informing the Court that recent events may in fact moot Count One of its complaint and requesting the Court rule on Counts Two and Three. After reviewing the pleadings, the case file, arguments of the parties, and the relevant case law, the Court enters the following opinion and order.

## I. Background

This suit is a challenge to a rule by the Texas Natural Resource Conservation Commission ("TNRCC") designed to regulate the emissions from ground-based equipment used to support aircraft operations and services in the Dallas–Fort Worth ("DFW") metropolitan area. The original plaintiff is the Engine Manufacturers Association, a nonprofit trade association representing the leading manufacturers of internal combustion engines used in nonroad vehicles and equipment, which are the kind to be regulated by TNRCC in this suit.[1]

The Air Transport Association of America ("ATA") filed its Motion to Intervene on July 19, 2000, as the principal trade organization of major air carriers in the country. Its twenty-three members include all major U.S. passenger and cargo airlines, and account for more than 95% of such air traffic in the United States. The ground service equipment regulations directly impose restrictions on ATA's members, and ATA raises Federal Aviation Act and Airline Deregulation Act preemption issues not raised by EMA. On August 2, 2000, the American Road and Transportation Builders Association ("ARTBA") filed its Motion to Intervene. ARTBA is a trade association representing over 5,000 members of the nation's transportation construction industry, including the construction equipment owners and operators subject to the fleet composition and construction ban regulations in this suit. Accordingly, the Court granted ATA's and ARTBA's motions to intervene.

In April 2000, TNRCC adopted standards and other requirements relating to the control of emissions from nonroad vehicles in the DFW area. Plaintiffs contend the standards, generally referred to as the nonroad source elements of the revised state implementation plan (SIP) for the DFW ozone nonattainment area (hereinafter the "DFW Nonroad SIP requirements"), are contrary to express provisions of the federal Clean Air Act, Federal Aviation Act, and Airline Deregulation Act. Three areas of regulation in the DFW Nonroad SIP requirements are at issue in this case: a limitation on airport ground support equipment (GSE), a prohibition on operation of construction equipment during early morning hours ("Morning Construction Ban"), and an accelerated purchasing requirement to affect the composition of the nonroad vehi-

---

1. TNRCC has challenged EMA's standing to bring this suit. The Court addresses the standing issue in Part III of this Order.

cle fleet ("Fleet Composition Requirement"). The key questions before the Court are whether the regulations promulgated by TNRCC are a valid exercise of state power or are invalid due to federal preemption. Pursuant to a stay issued by the Court in April 2001, the Court is now considering only the issues relating to EMA's standing to sue, the Morning Construction Ban, and the Accelerated Purchasing Requirement. All parties agree that there are no issues of material fact, and therefore summary judgment would be appropriate in this case.

## II. Summary Judgment Standard

Summary judgment may be appropriate if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the Court should "construe all facts and inferences in the light most favorable to the nonmoving party." *Hart v. O'Brien*, 127 F.3d 424, 435 (5th Cir.1997), *cert. denied*, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Both the movant and the nonmoving party bear burdens of producing evidence in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). First, the movant must show that "if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Hart*, 127 F.3d at 435, *citing Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. At that point, the burden shifts to the nonmoving party to establish "specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings." *Id.; see* FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. However, "[n]either conclusory allegations nor unsubstantiated assertions will satisfy the nonmovant's burden." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## III. Analysis

### A. EMA's Standing

 The Court first addresses the issue of standing as it relates to the Engine Manufacturers Association (EMA). Defendants have filed a Motion for Summary Judgment alleging that EMA lacks standing, and therefore must be dismissed. The Court does not agree, and thus denies defendants' motion on this issue. To demonstrate constitutional standing, a party must have suffered an injury in fact, an invasion of a legal interest which is "a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical;" also, there must be a causal connection between the alleged injury and the conduct that is the source of the complaint. Finally, there must be a likely, not merely a speculative, prospect that the injury will be redressed by a favorable decision. *Association for Retarded Citizens of Dallas v. Dallas Co. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 243 (5th Cir.1994), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). As a trade association, EMA may bring suit on

behalf of its members when: (1) its members would have standing to sue on their own; (2) the interests sought to be protected are germane to the organization; and (3) neither the asserted claim nor the requested relief requires individual member participation in the lawsuit. *See Self–Insurance Inst. of America, Inc. v. Korioth*, 993 F.2d 479 (5th Cir.1993).

Applying the law to the facts presented in the record, the Court finds that EMA meets the requirements for trade association standing. It is undisputed that engine manufacturers would have individual standing, and that the interests sought to be protected are germane to EMA's mission, and thus the first two prongs of the *Korioth* test are satisfied. Finally, EMA does not need individual member participation to satisfy its request for declaratory and injunctive relief invalidating the DFW Nonroad SIP requirements, as there is no issue of individual money damages and all EMA members share the same preemption interests.

Of course, defendants argue the GSE rule does not require engine manufacturers to make technological or engineering changes to nonroad engines. They allege the rule only requires the DFW airports to submit a plan for reducing emissions; the reductions may be from any source, not just GSE. Similarly, defendants generally argue the fleet composition and hours of operation rules do not require changes to nonroad engine technology.[2] The Court finds defendants' argument farfetched and lacking credibility. It is clear from the record that the DFW Nonroad SIP in question, if implemented, would dampen the sale of "equipment flexibility" and "ABT" engines vital to the industry, and would result in lost sales of diesel-certified GSE because of the stringent NOx standards. Indeed, EMA estimates the lost sales of nonroad engines, equipment, GSE, and generators to its members to be over $29 million. This is clearly a significant amount, and the Court finds the damages calculated are not merely hypothetical or conjectural in nature.

Finally, even if the Court were to find that there was no direct injury to engine manufacturers, the Court still agrees with EMA that EMA's members have a "clear and legally protectable interest" in ensuring proper enforcement of the Clean Air Act and guarding against a state law that violates federal preemption. *See Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261 (9th Cir.1994). In any case, therefore, EMA does have standing to sue and thus Defendant's motion for summary judgment on this issue must be denied.

**B. Morning Construction Ban**

■ On April 19, 2000, the Texas Natural Resource Conservation Commission (TNRCC) adopted the Morning Construction Ban, which prohibits the operation of construction equipment from 6:00am to 10:00am from June 1 to October 1 in several counties in the Dallas—Fort Worth metropolitan area. 30 TEX. ADMIN. CODE § 114.432. This prohibition would go into effect on June 1, 2005, and forbids any person from starting or operating nonroad

---

2. Defendants make the argument that EMA's members' injuries, if any, will result from the choices of third parties, i.e., the airports and airlines, and therefore EMA lacks standing to sue TNRCC. This argument smacks of "guns don't kill people, people kill people" pseudo-logic. It is clear that stringent requirements on fleet operators will have a direct, consequential effect on engine manufacturers, based on a "likely and credible chain of events" flowing from the DFW Nonroad SIP requirements. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Prestage Farms v. Board of Supervisors*, 205 F.3d 265 (5th Cir.2000).

diesel construction equipment at 50 horsepower or above. *Id.* EMA and ARTBA contend this TNRCC regulation is wholly preempted by § 209(e) of the federal Clean Air Act, which preempts states from adopting or enforcing "any standard or other requirement relating to the control of emissions" for new farm or construction vehicles under 176 horsepower. 42 U.S.C. § 7543(e)(1). For other nonroad vehicles, e.g., construction equipment over 175 horsepower, the CAA allows states limited authority to adopt standards or requirements relating to emissions. The key limitation is that only California can pioneer new standards or requirements, and other states may then mirror a California standard. *See* 42 U.S.C. § 7543(e)(2). It is undisputed that California has not imposed a standard or requirement analogous to the Morning Construction Ban.

TNRCC contends this rule is not designed to reduce construction equipment's overall emissions, but rather only to bar emissions during the morning rush-hour time "when on-road vehicles are already loading the air with $NO_x$ and other ozone precursors." *Defendants' Response and Cross–Motion for Summary Judgment,* at 14. TNRCC postulates the regulation would "probably" shift emissions to other times of the day, and contends owners or operators may apply for an exemption by submitting an alternate "emissions reduction plan showing that reductions will be achieved equivalent to those required by limiting hours of operation" and also submitting to the Advance Purchasing Regulation (to be discussed below). *Id.* Indeed, the Court finds it curious that TNRCC is

contending both that the Morning Construction Ban is *not* a rule designed to reduce omissions, but yet requires equipment owners or operators to submit an equivalent "emissions reductions plan" to obtain an exemption.

The Court notes that for motor vehicles, the CAA preempts only "any standard relating to the control of emissions" for motor vehicles, but incorporates a "savings clause" to allow states to regulate the use, operation, or movement of motor vehicles. *Compare* 42 U.S.C. § 7543(a),(b) *with* 42 U.S.C. § 7543(d). Thus, the CAA expressly creates a distinction between emission standards and in-use requirements for motor vehicles. In § 209(e), however, there is no such distinction or "savings clause" for in-use restrictions, but rather the subsection broadly preempts "any standard *or other requirement* relating to the control of emissions" 42 U.S.C. § 7543(c) (emphasis added). Based on the differing language between these two subsections of the Act, the Court concludes Congress did not intend the limited preemption of § 209(a)-(d) to apply to § 209(e), and thus the latter section must be afforded the full preemptive effect presumably intended by Congress.[3] *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Therefore, the Court concludes that the Morning Construction Ban, as a standard or other requirement relating to emission control, is preempted by § 209(e) of the federal Clean Air Act.

---

**3.** By doing so, the Court declines to defer to the Environmental Protection Agency's "interpretative rule" that "EPA believes states are not precluded under section 209 from regulating the use and operation of nonroad engines." 62 Fed.Reg. 67,733, 67,736 (Dec. 30, 1997). The legislative history and plain language of § 209(e) are clearly inconsistent with EPA's offered interpretation. *See Dresser Indus., Inc. v. Commissioner,* 911 F.2d 1128 (5th Cir.1990); *cf. Engine Mfrs. Assn. v. EPA,* 88 F.3d 1075, 1093–94 (D.C.Cir.1996)(deferring to EPA's interpretive rule without discussing or considering the legislative history or plain language of the CAA).

## C. Fleet Composition Requirement

■ On the same day TNRCC enacted the Morning Construction Ban, it also enacted the Fleet Composition Requirement, which EMA and ARTBA argue requires the construction industry to accelerate the phase-in of new equipment faster than depreciation and the federally mandated minimum useful life of such equipment would otherwise warrant. The purchasing requirement, also referred to as the "fleet composition rule," requires individuals wishing to own or operate equipment in the Dallas–Fort Worth area to have fleets with certain percentages of machines of the most modern low-emission design as prescribed by the federal standard. 30 TEX. ADMIN. CODE § 114.412(b),(d). According to the TNRCC, the earliest deadline is December 31, 2004, when at least 25 percent of a fleet comprised of 50 horsepower to under 100 horsepower machines must be upgraded machines that meet federal "Tier 2" emissions standards. *Defendants' Response*, at 16. By the end of 2005, 50 percent of the fleet must consist of Tier 2 vehicles, 75 percent by the end of 2006, and a full 100 percent of the fleet by December 31, 2007. Similarly, the regulation places a fleet composition quota on machines between 100 horsepower and 750 horsepower, as well as over 750 horsepower machines. 30 TEX. ADMIN. CODE § 114.412(b),(d). TNRCC argues the regulation places no technology-forcing sales restriction or sales quotas on nonroad equipment manufacturers, and in fact achieves a "synergy" between federal standards and state controls for emissions and air quality. *Id.*

ARTBA and EMA, however, contend the fleet composition requirement imposes emission standards or requirements that conflict with the preemptive effect of § 209(e) of the Clean Air Act, and that Texas did not follow § 209(e)(2) in adopting the purchase requirement. While TNRCC attempts to dismiss this claim as a "straw man," the Court disagrees with defendants' characterization of the arguments on this issue and addresses these contentions below. *See Defendants' Response*, at 17. ARTBA and EMA argue that the fleet composition requirement, by imposing an "aggressive" timetable for the phase-in of a Tier 2 fleet, effectively bans the use of new nonroad vehicles from federal Tier 1 model years even if the vehicles are within their federally-defined useful life span.[4] TNRCC suggests companies either lease Tier 2 equipment or extend the life of existing equipment until Tier 2 vehicles become available, but EMA and ARTBA contend the Clean Air Act preempts TNRCC from requiring plaintiffs to make this choice. *See Plaintiff ARTBA's Motion for Summary Judgment*, at 16.

The legal argument in support of plaintiffs' position on this issue is similar to the preemption argument discussed in the context of the Morning Construction Ban. The key question is whether the Fleet Composition Requirement constitutes a "standard or other requirement" within the meaning of § 209(e) of the federal Clean Air Act. Section 209(e)(1) expressly preempts states from adopting or enforcing "standards or other requirements" on new nonroad vehicles under 176 horsepower, and § 209(e)(2) limits Texas' authority to regu-

---

4. *See* 40 C.F.R. § 89.104(a)(3). EPA's nonroad Tier 1 regulations require vehicles and engines to comply with emissions standards throughout a useful life defined as the earlier of 8,000 hours or 10 years. Therefore, it is possible for nonroad vehicles purchased in 2003, which would be considered "new nonroad vehicles" under federal law until 2013, to be unlawful to operate under Texas law when the 100% Tier 2 requirement becomes effective as of December 31, 2007.

late other nonroad vehicles to adoption of the California standards or other requirements for which EPA has granted a waiver. All parties agree California has not adopted such standards or requirements, nor has it sought a preemption waiver.

The Court notes that EPA expressly includes "fleet average standards"—such as the fleet composition requirement sought by TNRCC—among the "standards and other requirements" that the CAA preempts. 40 C.F.R. § 85.1603(c)(2). TNRCC, however, points out that usage occurs in the subsection of § 209(3) applicable to locomotives, but makes no convincing argument why that same definition should not apply in the context of other nonroad vehicles as well. *See United States v. Cooper,* 135 F.3d 960, 962 n. 1 (5th Cir.1998); *see also American Auto. Mfrs. Ass'n v. Cahill,* 152 F.3d 196 (2d Cir.1998), *Association of Int'l Auto. Mfrs. v. Commissioner, Mass. Dep't of Env. Protection,* 208 F.3d 1, 6–7 (1st Cir.2000) (holding California's fleet composition requirements are "standards" under CAA § 209 in litigation involving other states' implementation of California standards). The Court also finds the regulation, despite TNRCC's attempt to portray it as merely an in-use control,[5] is clearly an attempt by the state to control the emissions of nonroad vehicles through a "standard or other requirement." Therefore, the Court holds the Fleet Composition Requirement sought to be implemented by Texas is preempted by § 209(e) of the federal Clean Air Act.

For the foregoing reasons, the Court enters the following orders:

IT IS ORDERED that plaintiff-intervenor ARTBA's Motion for Summary Judgment [# 41] and plaintiff EMA's Motion for Summary Judgment [# 48] are GRANTED with regard to the Morning Construction Ban, 30 TEX. ADMIN. CODE § 114.432, and the Fleet Composition Requirement, 30 TEX. ADMIN. CODE § 114.412(b),(d), and that these regulations are preempted by Section 209(e) of the federal Clean Air Act.

IT IS FURTHER ORDERED that Defendants' Motions for Summary Judgment [# 53, # 59] are DENIED.

---

5. In-use controls such as carpool lanes, restrictions on car use in urban areas, and programs to limit excessive idling are traditionally allowed by courts under § 209(d) of the Clean Air Act, and thus TNRCC is attempting to characterize the Fleet Composi-

tion Requirement as an in-use control rather than an emission standard preempted by § 209(e). *See Defendants' Response,* at 16, *citing Engine Mfrs. Ass'n v. EPA,* 88 F.3d 1075 (D.C.Cir.1996).